[Civ. No. 22974. Second Dist., Div. Three. Jan. 19, 1959.]

JEWELL ELLIS et al., Respondents, v. CITY OF LOS ANGELES, Appellant.

Roger Arnebergh, City Attorney, Bourke Jones, Assistant City Attorney, Joseph N. Owen and Weldon L. Weber, Deputy City Attorneys, for Appellant.

Eric A. Rose and Everett E. Demler for Respondents.

SHINN, P. J.—Appeal by the city of Los Angeles from an order granting plaintiffs a new trial in an action under the Public Liability Act (Gov. Code, § 53051), for the wrongful death of Treva Ellis. The verdict of the jury was in favor of the defendant; upon a former trial the jury had disagreed.

In October 1953, the city entered into a contract with Ellis' employer, Peter Kiewit and Sons, Inc., and another firm for the construction of a new sewer. The contractors also undertook to remove an old abandoned 54-inch segmented tile and cement sewer lying directly in the path of the proposed sewer

construction. The old sewer extended underneath the paved surface of Jefferson Boulevard between Rodeo Road and Higuera Street, a distance of approximately 1,100 feet. As Ellis was operating a pile-driving rig on Jefferson at a point midway between Rodeo and Higuera, the old sewer caved in and the rig toppled over on its right side, crushing him to death. At the location of the accident the sewer was 3½ feet below the surface of the street.

Plaintiffs are the widow and two minor children of Ellis. Their theory of recovery was that the existence of an abandoned sewer 3½ feet below the surface of the street constituted a dangerous and defective condition of public property, that the city had knowledge of the condition, and that it was liable to them in damages for failing to warn Ellis of the danger. (Gov. Code, § 53051.) Plaintiffs made a motion for new trial, which was granted upon the ground that the verdict was clearly against the weight of the evidence.

■ We have examined the transcript in the light of the well-established principle that unless, as a matter of law, a judgment in favor of the moving party would find no support in the evidence, the granting of a motion for new trial upon the ground of insufficiency of the evidence will not be disturbed on appeal. (*Brooks* v. *Metropolitan Life Ins. Co.*, 27 Cal.2d 305 [163 P.2d 689]; *Richardson* v. *Ham*, 44 Cal.2d 772 [285 P.2d 269].)

Jefferson Boulevard between Rodeo and Higuera was a heavily traveled thoroughfare, having a normal black-top surface and no noticeable defects or depressions. The city withdrew from public use and assigned exclusively to the contractors a 12-foot strip running along the north side of Jefferson from Rodeo to Higuera. Before work commenced, employes of the city had marked on the pavement within the 12-foot strip the center line of the proposed sewer as a guide for the contractors' employes.

The excavation of the old sewer and installation of the new proceeded as follows. First, two parallel slit trenches, each 18 inches wide and 10 feet deep, were dug along the outer edges of the 12-foot strip; dirt was removed from the trenches. Next, Ellis drove his rig along the strip and drove 36-foot steel pilings into the trenches along the outer walls. He backed along the strip, setting five pilings on one side, then moved forward and backed up over the same area, setting an equal number of pilings on the other side. An excavating rig operated by Ellis' coworker, Kinsey, then removed the dirt

and other materials between the two rows of pilings; steel was set and concrete poured for the new sewer; the excavation was then backfilled, the pilings extracted and the street resurfaced.

Ellis' rig, together with its attachments, weighed approximately 71 tons and was 11 feet 6 inches wide. It operated on 15-foot tracks, each 33 inches wide. The rig had 8,400 pounds of counterweight. The pilings dropped of their own weight to the bottom of the trenches and were driven into the ground further by means of a steam hammer which struck between 85 and 130 blows per minute, exercising a force of 13,500 pounds. Vibrations caused by the hammer blows could be distinctly felt by persons standing several hundred feet away from the rig.

As we have said, the old sewer was found to be 3½ feet below the surface at the place where the accident occurred. According to the plans furnished to Ellis' employer by the city, the sewer was between 3 and 3½ feet deep along Jefferson Boulevard to a point 600 feet west of Rodeo. The plans were kept in the Kiewit office at the job site. Ward White, Kiewit's project superintendent, had checked them before work started and knew what they disclosed about the location of the old sewer. He gave this information to Brigance, the pile superintendent, but he did not disclose it to Ellis or to Wampler, Ellis' foreman and immediate superior. Wampler and Kinsey both testified that they had no knowledge of what the plans disclosed about the depth of the old sewer.

Workmen excavating at the corner of Higuera and Jefferson some time before Ellis' accident discovered that the old sewer was 11 feet below the surface. About a week before Ellis' death, Kinsey was excavating on Jefferson at a point approximately 75 feet west of Rodeo. His rig, which was somewhat lighter than Ellis,' sank into a segment of the old sewer which had collapsed due to trenching operations undertaken to run off some excess water; the exposed sewer was found to be between 8½ and 9 feet below the surface at that location. Kinsey told Ellis what had occurred. In order to prevent a recurrence, Kinsey was told by his superiors to operate his rig across rather than lengthwise of the 12-foot strip.

John Bannister and Albert Anderson were city inspectors employed full-time at the job site. The former was senior engineer for the Board of Public Works, the agency charged with the maintenance of streets and sewers in Los Angeles, and the latter was his assistant. Both men were familiar with

the equipment and methods used in sewer construction; according to Bannister, Ellis' employer used normal methods and equipment. The inspectors testified that their duties consisted in making sure that the work proceeded in accordance with the plans and specifications; they had no authority to direct the contractors as to the manner of doing the work and it was established that they gave no directions. The inspectors were familiar with the maps kept in Kiewit's office and knew that the sewer was 3½ feet below the surface of Jefferson Boulevard at the point where Ellis later had his fatal accident. They were also familiar with the circumstances of Kinsey's accident. Bannister attended weekly safety meetings held for Kiewit's foremen at which times measures for the protection of the general public were discussed. Although it took Ellis approximately two weeks to drive pilings from Rodeo to the location of the accident, a distance of 525 feet, and although they observed him daily, the inspectors did not inform him of the depth of the old sewer and did not suggest to his superiors the possibility that the sewer might collapse under the rig.

Ward White testified that although he had seen the maps and knew that the sewer was deeper at both ends on Jefferson than the maps indicated, he made no effort to test their accuracy. This was for the reason that the sewer was a gravity-flow sewer, and he assumed that its depth would vary between 8½ feet at Rodeo and 11 feet at Higuera. White testified, as did Bannister and Anderson, that the possibility that the sewer might give way under Ellis' rig had never occurred to him.

Thomas C. Shields, an expert witness called by plaintiffs, gave his opinion that the weight of Ellis' rig, if distributed evenly over the ground, would be about 2,900 pounds per square foot on the surface; if only one-fourth of the area of the treads rested on the ground, the weight per square foot would be 11,600 pounds on the surface. In his opinion, a rig would not tip over unless only one-fourth to one-third of its treads rested on the ground. He also stated his opinion that the trenches cut by the contractors tended to deprive the sewer of lateral support. In White's opinion, the pressure per square foot exerted by the rig when only one-fourth of its tread area rested on the ground would be approximately 130 pounds at a point 4 feet below the surface of the street. If a rig is properly counterweighted and if an excessive weight is not placed on the boom, the tracks will remain flat on the

ground and the weight of the rig will be evenly distributed over the area occupied by the machine.

The city contends that the method employed by the contractor was the sole cause of the accident and that it cannot be held liable for the negligence of an independent contractor. Plaintiffs do not contend that the city would be liable for the contractor's negligence but correctly assert that if both were guilty of negligence which contributed proximately to the accident the negligence of the contractor would not relieve the city of liability. (*Irvin* v. *Padelford*, 127 Cal. App.2d 135, 141 [273 P.2d 539]; *Bady* v. *Detwiler*, 127 Cal. App.2d 321, 333 [273 P.2d 941], and cases cited.) The question is whether the city was negligent.

If liability existed on the part of the city it was by virtue of its duty under the Public Liability Act. Under section 53051 of the Government Code, a city is liable for personal injuries resulting from the dangerous or defective condition of public property if the legislative body, board or person authorized to remedy it had knowledge or notice of the dangerous or defective condition and for a reasonable time after acquiring knowledge or receiving notice, failed to remedy the condition or to take action reasonably necessary to protect the public against the condition.

A dangerous and defective condition of public property is one that creates an unreasonable hazard or one from which injury to those coming in contact with it might reasonably be anticipated. (*Gentekos* v. *City & County of San Francisco*, 163 Cal.App.2d 691, 696 [329 P.2d 943].) Ordinarily, the question whether a condition was dangerous is one of fact, not one of law for a reviewing court. (*Sandstoe* v. *Atchison, T. & S. F. Ry. Co.*, 28 Cal.App.2d 215, 218-219 [82 P.2d 216], and cases cited.)

The order granting plaintiffs a new trial implies that the trial court determined that all facts essential to the existence of liability on the part of the city were established by the weight of the evidence. The scope of our review of the order with respect to the findings on which it was based is the same as it would be if in a court trial findings had been made of all of the essential facts. It is the exclusive function of the trial court in ruling on a motion for a new trial on the ground of insufficiency of the evidence to determine whether the verdict is supported by the weight of the evidence. Considering the implied findings in this light, each of them having substantial support in the evidence and the reasonable infer-

ences, is binding upon us on the present appeal. ■ But if any one, of the court's implied findings of essential facts is without substantial support in the evidence the order granting a new trial for insufficiency of the evidence was improper and must be reversed. ■ It is, of course, error to grant a new trial unless the evidence would warrant a judgment in favor of the moving party. (*Roscoe Moss Co.* v. *Jenkins*, 55 Cal.App. 2d 369 [130 P.2d 477].)

■ In ruling upon the motion the court found in effect that it was established by a preponderance of the evidence that the city had knowledge that the sewer was only 3½ feet below the surface where Ellis was working, that Ellis did not have knowledge of that fact and that the inspectors knew or should have known that this fact created a dangerous condition, due to the manner in which the work was being done. There was nothing inherently dangerous in the installation and maintenance of the sewer line, although at places it was only 3½ feet below the surface of the street. Plaintiffs say that the mere occurrence of the accident was sufficient proof that Ellis was working under dangerous conditions, and this, of course, is true. But the crucial question which we shall discuss is whether there was any evidence that the agents of the city knew, or in the exercise of ordinary care, would have known that the conditions were dangerous.

It is not, nor could it be reasonably contended, that the city, with knowledge of the manner in which the work was being carried on, had a duty to relocate the sewer, place barricades in the area, or stop the work. Plaintiffs' sole contention is that Ellis was working under dangerous conditions due to the fact that the sewer was but 3½ feet below the surface, that fact was known to the inspectors, but unknown to Ellis, and that it was the duty of the inspectors as responsible agents of the city to inform Ellis of the location of the sewer at the place where he was working.

Due to the theory upon which plaintiffs presented their case at the trial and seek to sustain the order, we shall assume for the purposes of our discussion that if the inspectors had knowledge of a dangerous condition which was unknown to Ellis the city had a duty through the inspectors to warn Ellis of the danger, even though it had furnished drawings to the contractor which showed the location of the sewer and even though the danger of the operation was due solely to the manner in which the work was being done. If knowledge of the precise manner in which the work was carried on was brought home

to the city it could only have been through the city's inspectors who were watching the work. The inspectors had general knowledge of the manner in which the excavation and removal of the old sewer was being done. That fact would not have placed the city under a duty to warn Ellis that the method of operation was unsafe unless the inspectors knew or in the exercise of ordinary care would have known that the operation entailed an unreasonable risk.

The liability of the municipality is for negligence, which is not to be presumed. Under the statutory liability there can be no negligence in failing to repair or give warning of a condition unless it is one which is known, or in the exercise of ordinary care would be known to impose an unreasonable risk of injury. If this were not so a municipality would be subject to liability without fault by force of the statute alone, whereas an individual in similar circumstances would be held blameless. The liability statute cannot be given application that would render the municipality an insurer against accidents. Knowledge of the dangerous nature of the condition must be shown. (*Howard* v. *City of Fresno,* 22 Cal.App.2d 41 [70 P.2d 502].)

 With respect to the question of knowledge of a dangerous condition in the present case there were many factors to be considered. There was the weight of the equipment, the strength of the old sewer line, the carrying capacity of 3½ feet of pavement above the sewer, the lateral support furnished by the earth surrounding the sewer and the vibration of the earth caused by the hammering and its weakening effect. Another important consideration was the manner in which the boom might be operated. As its weight would be thrown to one side or the other so would the weight of the equipment be increased on one or the other of the treads, thus materially increasing the per square foot pressure. It was shown by photographs in evidence that the support for the right tread gave way and it fell deep into the hole with the cab resting on the ground and the opposite tread high in the air. There was also the negative fact that Ellis had driven piling for over 500 feet, operating in the same manner and without incident. While it was not incumbent upon the city to prove that the inspectors believed the operation to be a safe one, the safety of it up to the time of the accident, was some justification for their having no fear that it might be dangerous. Although plaintiffs say "the very fact that the rig broke into the abandoned sewer is in itself evidence of a

dangerous condition,'' they merely assume that the inspectors should have recognized the danger, due to the fact that the old sewer was only 3½ feet below the surface. The inspectors were present only to see that the work was done according to contract. They had no authority to direct the operations and no duty to undertake the solution of the difficult engineering problem which would determine whether the location of the sewer created a dangerous condition. All the factors we have mentioned created an engineering problem for which there was no ready answer, even by competent observers.

Two expert engineering witnesses testified, one for the plaintiffs, the other for defendant. Neither witness testified to the weight per square foot of the equipment at a point 3½ feet below the surface if the treads rested wholly on the surface. Each testified as to the increased weight that would be cast upon one-third or one-fourth of the rig if the remainder of the treads should be tipped off the ground. This was a purely speculative supposition since there was no direct evidence of the position of the rig on the ground at the time its support collapsed. Nor was there evidence that during the operation two-thirds or three-quarters of the weight of the rig was lifted off the ground. Obviously, none of the engineers on the job suspected that an accident would occur. There had been no similar accident and, in fact, the operation under the physical conditions was an unusual one in which the engineers were not shown to have had any previous experience.

Although the implied findings of the court in granting the motion are entitled to every consideration they cannot be regarded as conclusive on the appeal. If they are without any substantial support in the evidence they must be denied effect.

In many cases the courts of review have been obliged to reverse judgments which imposed liability under the Public Liability Law for insufficiency of the evidence to establish knowledge on the part of the municipality or other public body of the existence of a dangerous or defective condition.

There have been many cases of defects in sidewalks and streets which, because of their ''trivial'' character, placed the municipality under no duty to make repairs or give warning. (*Nicholson* v. *City of Los Angeles*, 5 Cal.2d 361 [54 P.2d 725] ; *Barrett* v. *City of Claremont*, 41 Cal.2d 70, 71-73 [256 P.2d 977], and cases cited; *Ness* v. *City of San Diego*, 144 Cal. App.2d 668 [301 P.2d 410] ; *Beck* v. *City of Palo Alto*, 150 Cal.App.2d 39 [309 P.2d 125].)

The rationale of such cases is that it appeared from the

evidence, as a matter of law, that the defect was not one that rendered the condition dangerous to an extent that would subject the users to an unreasonable risk, and the failure of the municipality to discover and repair it was not a breach of duty. Although a defect has sometimes been called "trivial" because it was small, it was not the size of the defect but the likelihood of its causing accidents that determined whether it should have been discovered and repaired. It is the obviously dangerous character of the defect, and not alone its size, which the municipality is required to take notice of and repair. A small hole in a walkway may be more dangerous than a large one. (*Blumberg* v. *M. & T. Incorporated*, 34 Cal.2d 226 [209 P.2d 1].)

The record is devoid of any evidence that Ellis' work was being carried on under dangerous conditions, other than the mere fact that an accident happened. So, too, accidents, happened in a multitude of the "trivial" defect cases in which it was held on appeal that since knowledge of the danger was not brought home to the defendant no liability was established. Mr. Prosser says, second edition, section 30, page 121: "The culpability of the actor's conduct must be judged in the light of the possibilities apparent to him at the time, and not by looking backward 'with the wisdom born of the event.' The standard must be one of conduct, rather than of consequences. It is not enough that every one can see now that the risk was great, if it was not apparent when the conduct occurred. (Citing Cardozo, C. J., in *Greene* v. *Sibley, Lindsay & Curr Co.*, 257 N.Y. 190, 177 N.E. 416.)"

Plaintiffs have advanced no theory of the evidence under which the inspectors would be chargeable with knowledge of a dangerous condition and it is significant that two juries failed to find that they had or should have had such knowledge. Moreover, it was not shown that the inspectors knew that Ellis was less informed than they were of the working conditions. To be sure there had been an accident to the equipment of Kinsey due to trenching in order to dispose of an excess of underground water at one point, a condition which did not exist elsewhere, but Ellis was familiar with that occurrence and it was as well known to him as it was to the inspectors.

A municipality is chargeable with knowledge of conditions which would be disclosed by a reasonable inspection, one conducted in the exercise of ordinary care. Only if held to the

highest degree of care would the inspectors have been required to make a scientific analysis of the factors which bore upon the safety of the methods employed in the work.

There was, in our opinion, no basis in the evidence for charging the inspectors with notice. They were therefore under no duty to warn Ellis, and absent such duty upon their part the city must stand absolved of liability for the accident.

The order is reversed.

Wood (Parker), J., and Vallée, J., concurred.

A petition for a rehearing was denied February 17, 1959, and respondents' petition for a hearing by the Supreme Court was denied March 18, 1959.