[Civ. No. 65781. Second Dist., Div. Four. Sept. 23, 1983.]

DIANE MUFFETT et al., Plaintiffs and Appellants, v.
SILAS ROYSTER et al., Defendants, Cross-complainants and Appellants;
THE STATE OF CALIFORNIA ex rel. DEPARTMENT OF
TRANSPORTATION, Cross-defendant and Respondent.

294

COUNSEL

Kiernan & Finnegan, B. James Finnegan and Matthew J. Cohen for
Plaintiffs and Appellants.

Popelka, Allard, McCowan & Jones, James C. Jones, Jr., and Michael G. Ackerman for Defendants, Cross-complainants and Appellants.

Robert F. Carlson, Joseph A. Montoya, Robert L. Meyer, Beverly I. Saltz and Michael J. Gittleman for Cross-defendant and Respondent.

## OPINION

**KINGSLEY, Acting P. J.**—Plaintiffs sued defendants Silas Royster, San Francisco Royster Trucking Company, Philip Harmon, and other defendants for damages for the wrongful death of Melvin Muffett.

Defendants Royster and the Royster Trucking Company answered with a general denial and the affirmative defense of contributory negligence. Defendants' amended answer added the bar of Labor Code section 3601, alleging worker's compensation to be the exclusive remedy available to plaintiffs.

The court denied plaintiffs' motion for partial summary judgment against defendants. This motion had alleged that decedent was not an employee of defendants Royster and Royster Trucking Company at the time of the accident.

The court granted defendants leave to file a cross-complaint for indemnity against the State of California.

The jury returned special verdicts that Melvin Muffett, plaintiffs' decedent, and defendant Harmon, were employees of defendant Royster at the time of the accident and that they were acting in the course and scope of their employment. The court gave judgment to defendants.

Defendants, believing the accident was caused as a result of a dangerous condition of public property, cross-complained against the State of California, Department of Transportation.

The state sought dismissal based on "design immunity" (Gov. Code, § 830.6), and the trial court ruled in favor of the state. The court ruled that the freeway was not a "dangerous condition" at the time of the accident on the basis that there was no evidence that a person observing the posted speed sign (45 m.p.h.) would encounter difficulty driving the curve involved.

The cross-defendant, State of California's motion for nonsuit was granted removing the State of California from the case. The decision of the trial court granting the motion for nonsuit is the subject of the cross-appeal. The

cross-complainants assert that if the verdict of the jury and the judgment entered thereon are affirmed by this court, the points raised by way of their appeal are moot, and that appeal may be dismissed.

Cross-complainants allege that the state did not carry its burden with respect to design immunity and that the court erred in deciding that there was not a "dangerous condition" on the basis that the posted speed was also the maximum speed at which a prudent driver, using due care, would negotiate this curve.

After the nonsuit was granted, the wrongful death action was submitted to the jury. After the judge entered a special verdict in favor of defendants, plaintiffs moved for new trial and judgment notwithstanding the verdict. The motions were denied.

Plaintiffs appeal from judgment on the special verdict, and cross-complainants appeal from the judgment of nonsuit on the cross-complaint.

### FACTS

Decedent, Melvin Muffett, was riding as a passenger in a tractor driven by defendant and cross-complainant, Philip Harmon, and owned by defendant and cross-complainant Silas Royster. Royster had entered a conditional sales agreement for the tractor with Harmon. The tractor was hauling two trailers owned by Royster, loaded with wooden pallets which were to be delivered to Los Angeles. Harmon and decedent knew each other for six years and were close friends.

Decedent went to truck driving school and approached Royster to purchase a 1966 tractor. Decedent also entered a "sub-haul agreement" in which during the term of their contract of sale the decedent agreed to "drive said tractor and perform such other functions as may be necessary from time to time including, but not limited to, loading, unloading, tarping, tying down loads, washing tractor and trailers, servicing and general maintenance of same." The agreed compensation for services rendered by decedent was 78 percent of the state rate for all hauling done by him, less Public Utilities Commission transportation tax, trailer rentals and any advances.

The agreement identified Muffett as an independent contractor, and specifically states that Muffett is not an employee but is self-employed. Muffett was to provide his own liability insurance as well as worker's compensation. Muffett paid for his own fuel, maintenance, parts and service, received no vacation pay or pension benefits, and Royster did not withhold S.D.I. or social security.

Defendant and cross-complainant, Harmon, entered into a similar relationship with Royster. Royster agreed to assist in training Harmon to operate the truck, with the understanding that Harmon would not be able to remove the truck from Royster's yard until Royster was satisfied that Harmon knew how to operate it. Royster had Harmon practice with the truck in his yard. Other subhaulers had similar contracts with Royster and they kept their trucks in Royster's yard. Loads were assigned to subhaulers by Royster's wife. Either Royster or his wife would tell the drivers where and when to pick up loads, and where and when to make deliveries. Royster had the right to tell his drivers what route to take, how loads should be placed on their trailers, how to tie down a load, and how to maintain and service their tractors. On occasion, he inspected their loaded tractor and trailer to be sure the load was tied down properly.

He also inspected the tires and felt that if the tires were unsafe, he could refuse to allow the drivers to haul a load. On occasion, he instructed his drivers (including decedent and Harmon) to perform maintenance operation on trailers.

The tractors purchased by decedent were painted with the company colors and bore the company logo and the company's Public Utilities Commission number. Decedent and Harmon made all hauls under authority Royster obtained from the Public Utilities Commission.

On occasion, drivers would call midtrip to obtain the next assignment and if drivers did not perform satisfactorily, Royster had the right to terminate them.

The drivers were paid on the first and fifteenth by Royster, and not by the companies that make shipments. The truck purchase and subhaul agreements were common within the industry.

The subhaul agreements provided that Royster would not carry a worker's compensation policy, but, on the advice of his broker, Royster acquired a policy. He met with his drivers and took a vote on obtaining such coverage. The agreement was that he would deduct $40 per month from their gross hauling receipts. The pay records relating to decedent indicate that the first deduction made for worker's compensation insurance from his pay was two weeks after the accident. The deduction was $120 for June, July and August.

The decedent assisted Harmon in learning the mechanics of the truck. Harmon and decedent picked up a load and Royster told decedent that he was going to switch the load and have him pick up a load of pallets to be

delivered to Los Angeles. Harmon was upset at having the load switched at the last minute, but he felt he did not have a choice. They were instructed to unload the truck and give that load to someone else. Harmon viewed Royster as his boss and considered himself at Royster's beck and call.

Harmon suggested that it would be best to use the tractor decedent was buying from Royster. They asked Royster if he had any objection to switching tractors and Royster responded that he did not as long as it was understood that decedent was in charge and decedent was to be paid. Harmon had a learner's permit and Royster told him he needed one more trip to Los Angeles before Royster would consider "signing off" his license, because he felt Harmon needed a little more experience.

During the trip decedent instructed Harmon. Decedent told Harmon to get into the number two lane, to head toward Santa Ana, at the sign advising drivers of a road change. Harmon put on his blinker, traffic was heavy and he slowed down from 55 to 50 just prior to the accident. Two diamond shaped signs indicated 45 miles per hour. The vehicle was drifting to the right, hit the gutter and flipped over. Sometime after, at the hospital, Muffett died.

The curve where the accident occurred was banked. On the high side of the curve there was a gutter and shoulder at a different slope than the road surfaces. Evidence showed that the rapid change in slope causes a rapid change in the center of gravity and that loss of control may result. In 1971 and 1972 there were 41 accidents here. Prior to the accident in question, the traffic department recommended that the gutter and shoulder be paved over to match the super-elevation of the road surface, in order to "reduce further danger to the public safety."

The legal speed at the curve was 55 miles per hour but the posted speed was 45 miles per hour. A highway patrol officer and tow truck driver testified to many trucks overturning here. According to some testimony, the 45 mile per hour speed was the recommended speed but not the mandatory speed limit.

The design plan for the curve specified that a rolled gutter be constructed on the shoulder. The purpose of the rolled gutters is to discourage people from driving on the shoulder except in an emergency. The design was approved by at least three civil engineers, and a civil engineer testified that the design was reasonable. The rolled gutter was constructed in accord with the gutter described in the department's manual.

The Department of Transportation's planning manual had also described the curve and the warning speed—advisory signs that were actually in place

at the time of the accident were signs also approved by the planning manual. The two sets of curve warnings, speed advisory signs were in plain view and were visible to approaching drivers.

## PLAINTIFFS' APPEAL

■ Appellants first argue that "the court erred in failing to properly submit special verdicts to the jury such that judgment was entered for defendants on inadequate findings that plaintiffs' recovery was barred by the exclusive remedy of worker's compensation." Appellant asserts that, in order to invoke the exclusive remedy of worker's compensation, a special verdict that defendant Royster "secured payment of compensation" had to be made.

On submitting the case to the jury, the court instructed the jurors on the special verdicts they would be required to return. The first four questions of the special verdict concerned two issues dealing with whether Harmon and Muffett were employees of Royster and whether they were acting in the scope of employment. The court instructed the jurors that if they answered "yes," they were to disregard other issues. Based on the jurors' "yes" answers, the court ordered judgment for all defendants and against plaintiffs. Thus, the court concluded that defendants met their burden under Labor Code section 3601,[1] so as to bar plaintiffs' recovery under the common law theory of negligence, without ever having a special verdict that the employer had secured payment of compensation under Labor Code section 3706.[2]

Appellants are correct that where plaintiffs, as here, include no allegations in their complaint of an employer-employee relationship, the employer defendant must show that he "secured payment of compensation." (Lab. Code, § 3706; *Doney* v. *Tambouratgis* (1979) 23 Cal.3d 91, see fn. 8 [151 Cal.Rptr. 347, 587 P.2d 1160].) Appellants are also correct that, where the employer fails to secure payment, the employee may bring a civil action. (Lab. Code, § 3706.)

However, we see no reason why the court would be required to submit the question of whether Royster "secured payment of compensation" to the jury in the form of a *special verdict*. A special verdict is a device by which

---

[1] Labor Code section 3601 refers to the employer's burden to secure the worker's compensation.

[2] Labor Code section 3706 reads: "If any employer fails to secure the payment of compensation, any injured employee or his dependents may bring an action at law against such employer for damages, as if this division did not apply."

the jury finds *facts* only, leaving judgment to the court. (Code Civ. Proc., § 624.) Whether Royster's conduct in arranging for the worker's compensation policy and making the $1,000 payment, and then improperly deducting the equivalent of premiums from the driver's paychecks,[3] legally amounted to "securing payment of compensation" is in part a legal question, and therefore is a matter for the judge rather than the jury.[4] Thus, there was no reason to submit this question to the jury in the form of a special verdict.

## I

■ Appellants argue that defendant Royster did not "secure payment of compensation as required by Labor Code section 3706" and is not, therefore, entitled to the immunity of the act. Appellants admit to not raising the issue below. ■ An issue not raised at trial can be considered for the first time on appeal when it relates to "noncurable, undisputed" evidence as a pure question of law. (*Wilson* v. *Lewis* (1980) 106 Cal.App.3d 802 [165 Cal.Rptr. 396].) ■ An appellant may be permitted to change *his* theory when a question of law is presented on the facts appearing in the record. That is because in such a case the opposing party is not required to defend for the first time on appeal against a new theory which contemplates a controverted factual situation. (See *Ward* v. *Taggart* (1959) 51 Cal.2d 736 [336 P.2d 534].)

■ Here, the facts are not disputed that Royster arranged for the policy, paid $1,000, and then was to deduct some payments from the hauler's pay.[5] Whether or not these undisputed acts by Royster legally constitute "securing payment of compensation" is a legal question which we may deal with for the first time on appeal. Thus, although counsel did not suggest below that payment by the decedent of a portion of the cost of procuring the policy barred defendants from raising Labor Code section 3601 as a defense we conclude that question is open to us on appeal.

## II

■ Defendants object to raising the doctrine of equitable estoppel for the first time on appeal. (*Roam* v. *Koop* (1974) 41 Cal.App.3d 1035, 1044 [116 Cal.Rptr. 539].) Appellants never raised the issue of equitable estoppel and should not be permitted to do so now. However, as we said earlier,

---

[3] It is clearly improper under the Labor Code to shift the payments for worker's compensation from the employer to the employee. (See § 3751.)

[4] In the case at bench, there was no dispute as to the operative facts.

[5] Failure to secure payment of compensation by one who knows or should know of the obligation is a misdemeanor. (Lab. Code, § 3751.)

appellants may raise the issue of whether Royster "secured payment" for the first time on appeal.

### III

 Appellants argue that section 3601 must be interpreted with reference to 3751. Under 3751, it is a misdemeanor for employers to deduct payment for worker's compensation from their employees, and under 3601, an employer may not raise worker's compensation as a bar to a civil suit unless he has "secured payment of compensation."

Defendants argue that only 3601 applies and that Labor Code section 3751[6] has no application to this case. Defendants point out that there is no authority that violation of section 3751 precludes the employer from raising Labor Code section 3601 as a defense to a civil action.

We hold that Royster's deduction of premiums from the hauler's pay precludes a finding that Royster "secured payment of compensation." The law clearly puts the burden of payment on the employer and does not permit shifting the burden of payment to the employee. To allow the employer to raise the worker's compensation acts as a bar to the civil suit where the employer so blatantly fails to comply with so fundamental a part of the act, would be inconsistent with the purposes of the act.

While defendants may be correct that 3751 does not specifically relate to barring a civil action by an employee, it is clear that an employee is not barred from bringing a civil action when the employer has not "secured payment." It is also clear that the Legislature intended to put the burden on the employer to pay the premiums and "to secure payment." In construing a statute, a court should ascertain the intent of the Legislature. (*In re O'Neil* (1977) 74 Cal.App.3d 120 [141 Cal.Rptr. 338].) We hold that the act of the employer in seeking payment from an employee for the cost of the worker's compensation insurance in violation of the Labor Code, also precludes the employer from raising the worker's compensation act as a bar to a civil suit.

### IV

 Appellants argue that the court erred in refusing to instruct the jury to give significant weight to the contracts between decedent and Royster in determining whether Muffett was an independent contractor or an employee.

---

[6]Under 3751, an employer's deduction from the earnings of an employer to cover all or part of the worker's compensation coverage is a misdemeanor.

Plaintiffs requested and were refused the following instructions:

1. "An independent contractor is one who . . . so long as he retains the right of control over the methods to be used to accomplish the end result. The terms of the contract between the parties is a significant factor to be considered in determining the issue. However those terms are not conclusive."

2. "A written contract between two parties will be construed strictly against the person who drew up the contract. Any ambiguities or uncertainties will be decided against the person who prepared the contract."

There was no error in the court's instructions. Certainly the written agreement is a significant factor in determining whether one is an independent contractor. (*Mission Ins. Co.* v. *Workers' Comp. Appeals Bd.* (1981) 123 Cal.App.3d 211 [176 Cal.Rptr. 439].) However, appellants' assertion in their briefs that the "courts should have looked primarily to the controls to determine the issue of employment" is not correct. The court properly instructed on *right* to control. Right to control is the dominant criterion (*Empire Star Mines Co.* v. *Cal. Emp. Com.* (1946) 28 Cal.2d 33, 43 [168 P.2d 686]) and is the most significant test. (*Tieberg* v. *Unemployment Ins. Appeals Bd.* (1970) 2 Cal.3d 943, 950 [88 Cal.Rptr. 175, 471 P.2d 975].)

Further, the jury below was instructed that the contract may be considered although they were told the terms of the contract are not conclusive. That instruction was correct. As we have said, right to control is the most significant test (*Tieberg* v. *Unemployment Ins. Appeals Bd.*, *supra*) and the written agreement is "a significant factor." (*Mission Ins. Co.* v. *Workers' Comp. Appeals Bd.*, *supra,* 123 Cal.App.3d 211.)

The instructions of the court that were given did ask the jury to consider the terms of the contract, and that is all that is required under the law.

### V

■ Appellants argue that defendants failed to present sufficient evidence to support a finding that Melvin Muffett and Philip Harmon were employees of defendant Royster at the time of the accident.

While it is true that there was a great deal of conflicting evidence on the subject, there was sufficient evidence to support a finding that Muffett and Harmon were employees. It was Royster's practice with a new driver to have other drivers go along on a driver's first haul. Royster had the right to inspect the load to be sure it was properly tied down. Royster inspected

the tractors for safety. Royster testified that he had the right to control the route and other rights. ▮ The testimony of one witness, even a party himself, may be sufficient. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [122 Cal.Rptr. 79, 536 P.2d 479].)

The case of *Flickenger* v. *Industrial Acc. Com.* (1919) 181 Cal. 425 [184 P. 851, 19 A.L.R. 1150], is cited here. In *Flickenger,* the contract provided that the hauler transport a truckload of freight between specified points each day for a specified time at a specified rate, with the hauler to pay its own expenses and upkeep, with no control by his employer. The hauler therein was held to be an independent contractor.

▮ The *Flickenger* case, *supra,* is to be distinguished from the case at bar on several grounds. Royster supplied the trailer. Royster would tell the drivers where and when to pick up the load. Royster inspected the load, and Royster had the right to tell the drivers which route to take. In short, Royster had the right to exercise control. Although at times the cases are difficult to distinguish based on the "right to control" test, the "result in each case seems to turn on the subjective knowledge of the employer." (Samuelsen, *Employee or Independent Contractors* (1975) 10 U.S.F. L.Rev. 133, 145.) There was sufficient evidence to support the view that the decedent and Harmon were employees.

## VI

Appellants argue that the court exceeded its authority and abused its discretion in allowing admission of evidence on the issue of whether Harmon was acting in the scope of his employment at the time of the accident. This issue was raised by way of interrogatories and there was a denial by Royster that Harmon was acting in the scope of employment. Appellants concede that admission of such evidence was improper only as it related to defendant Royster.

▮ Royster made a sworn denial that Harmon was acting in the scope of employment at the time of his admission. Code of Civil Procedure section 473 empowers the trial court to relieve a party served with a request for admission from the consequences of a defective denial, but no motion was made under Code of Civil Procedure section 473. However, Royster argues that he may be relieved under Code of Civil Procedure sections 2033 and 2034. *Kaiser Steel Co.* v. *Westinghouse Elec. Corp.* (1976) 55 Cal.App.3d 737, 744 [127 Cal.Rptr. 838], which permits the court to relieve a party of the consequences of *failing* to admit or deny where there is good cause, or from a defective denial. However, that case does not relieve parties who have made an unequivocal denial, as here. Royster should have sought relief

under Code of Civil Procedure section 473. Granting relief from an unequivocal denial is not the same as granting relief from a defective denial, or a failure to deny, since the defective denial or failure to deny may involve simple oversight or carelessness, and relief from an unequivocal denial may be related to the discovery of new information or other factors.

### CROSS-COMPLAINANTS' APPEAL

Nonsuit was granted in favor of cross-defendant, State of California, and against all cross-complainants, Royster, Royster Trucking Company and Harmon. Cross-complainants appealed from judgment on the cross-complaint.

Royster, in his appeal, asserts that the tractor turned over as a result of a "dangerous condition" of state property (the rolled gutter) and that the curve warning and speed signs were inadequate notice of the danger. Specifically, Royster contends that the court's determination that the road was not in a "dangerous condition," on the ground that a person driving under the posted speed would not have difficulty on the curve, was in error. Royster also contends that the state failed to carry its burden of proof with respect to design immunity in that it has not proved a defective design, and because the state failed to give adequate warning of a "dangerous condition" of which it had notice. The state contended that the road was not the proximate cause of the accident, the road was not in a "dangerous condition" because there was no use of the road with "due care," that the state is immune from liability on the theory of "design immunity," and that there were adequate warnings to the public of the danger.

### I

First, appellants argue that the trial court erred in holding, as a matter of law, that any driver traveling in excess of the posted speed was not using "due care." A finding that the property was not used with "due care," precludes the possibility of finding a "dangerous condition" of public property, under the terms of Government Code section 830, and unless there is a "dangerous condition" the government is not liable.[7]

---

[7]Government Code section 830 reads: "(a) 'Dangerous condition' means a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used. [¶] (b) 'Protect against' includes repairing, remedying or correcting a dangerous condition, providing safeguards against a dangerous condition, or warning of a dangerous condition. [¶] (c) 'Property of a public entity' and 'public property' mean real or personal property owned or controlled by the public entity, but do not include easements, encroachments and other property that are located on the property of the public entity but are not owned or controlled by the public entity."
Government Code section 835 reads: "Except as provided by statute, a public entity is

 We agree that the existence of a "dangerous condition" is usually a question of fact and may be resolved as a question of law only if reasonable minds can come to but one conclusion. (*Harland* v. *State of California* (1977) 75 Cal.App.3d 475, 483 [142 Cal.Rptr. 201].) Therefore, the question before us is whether driving over the curve over the posted speed limit indicates a lack of "due care" as a matter of law, such that the government can incur no liability under Government Code section 835, or whether going over the posted speed limit creates a factual question as to whether or not the property was used with "due care."[8] Stated another way, can there be a "dangerous condition" on a highway, within the meaning of Government Code section 830, such that a public entity may incur liability, under Government Code section 835, where a driver violates a posted speed limit at the time of the accident, in view of the fact that the definition of the term "dangerous condition" in Government Code section 830, subdivision (a) requires "due care" in the use of the public property?

There is much discussion in the briefs as to whether the posted speed was "advisory" or "mandatory."[9] Our research has not disclosed any cases suggesting that speed signs posted by the state refers to "advisory" speed or "suggested" speed. Nevertheless, we see no reason to depart from the general rule that whether or not there is a "dangerous condition" is a question of fact. (*Torkelson* v. *City of Redlands* (1961) 198 Cal.App.2d 354 [17 Cal.Rptr. 899]; *Ellis* v. *City of Los Angeles* (1959) 167 Cal.App.2d 180 [334 P.2d 37].) If a "dangerous condition" is a factual question, and use with "due care" is one aspect of the existence of a "dangerous condition," it follows that any questions as to whether a defendant used "due care" when exceeding the posted speed on the curve are also factual questions.

We think this conclusion is pragmatically sound. First of all, it is conceivable that some rare traffic situations may occur where going five miles per hour over the rate on the sign on the curve may actually avoid a collision with other vehicles, and, that, under those circumstances the act of going over the posted speed may be prudent, and "due care."

---

liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either: [¶] (a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or [¶] (b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."

[8]Thus, we are not here, at the moment, concerned with whether or not there was use of the property with due care, for purposes of comparative negligence or contributory negligence, but only whether there was use with "due care" such that there was a "dangerous condition" for which the public entity may be liable under the Government Code.

[9]There was testimony that the posted speed limit was not the maximum safe speed.

Furthermore, to hold that going over the posted speed on a curve is not "due care" as a matter of law would encourage the state to avoid liability by posting lower and lower speed limits, and the state would have no incentive to remedy potentially dangerous situations upon a highway.

Our holding here is supported by those cases which hold that speed in excess of a mere prima facie limit is not negligence as a matter of law, and the burden is on the party asserting negligence. (*Miller* v. *Northwestern Pac. R.R. Co.* (1962) 206 Cal.App.2d 500 [24 Cal.Rptr. 99].) If speeding in excess of the prima facie limit is not negligence as a matter of law, then going faster than the posted speed (whether characterized as "advisory" or not) should not indicate "lack of due care" as a matter of law.[10]

## II

The appellants argue that the state was not entitled to a nonsuit on the theory of design immunity. We disagree.

■ The "Design Immunity" defense (Gov. Code, § 830.6) is raised on a motion for summary judgment, nonsuit, and directed verdict. On submitting such matter, the trial court is invited to rule whether the evidence is sufficient to support the design immunity defense, and if the trial court determines that the defense has been established, the jury is instructed that the public entity is immune as a matter of law for design related damages. (*Mozzetti* v. *City of Brisbane* (1977) 67 Cal.App.3d 565 [136 Cal.Rptr. 751].) For reasons stated below, we hold that there was sufficient evidence to support its design immunity defense.

■ In order for the state to establish design immunity as a defense, the state must show (1) A causal relationship between the plan and the accident; (2) discretionary approval of the plan prior to construction; (3) substantial evidence supporting the reasonableness of the design. (*Anderson* v. *City of Thousand Oaks* (1976) 65 Cal.App.3d 82, 88 [135 Cal.Rptr. 127].) The state is entitled to a defense of design immunity if there is any substantial evidence on which the approval can be reasonably based, and it is error to submit a design defense to a jury. (*Mozzetti* v. *City of Brisbane, supra,* 67

---

[10]There is also dicta in *Wilding* v. *Norton* (1957) 156 Cal.App.2d 374 [319 P.2d 440], suggesting that the presence of signs which create a special speed zone is a factor to be given consideration in judging the reasonableness of motor vehicle speed.

Cal.App.3d 565.) For example, a conflict will not create a triable issue of fact to defeat a motion for summary judgment. (*Moritz* v. *City of Santa Clara* (1970) 8 Cal.App.3d 573 [87 Cal.Rptr. 675].)

In determining whether evidence before the trial court is substantial, the question is whether the evidence "reasonably inspires confidence" and is of "solid value." (*Davis* v. *Cordova Recreation & Park Dist.* (1972) 24 Cal.App.3d 789, 798 [101 Cal.Rptr. 358].) Although the evidence below was conflicting, there was substantial evidence supporting the view that the design of the gutter was reasonable. A witness, Mr. Harlan Weatherhold, a licensed civil engineer, who had himself designed freeways, testified that the rolled gutter can be driven over safely and served a valid purpose and this was in itself substantial evidence supporting the reasonableness of the design.

## III

The state also argues that there was no substantial evidence to show that the rolled gutter was a cause of the injury. For a condition to be a cause of an injury, it must be the cause in fact of the injury. (*Akins* v. *County of Sonoma* (1967) 67 Cal.2d 185, 198-199 [60 Cal.Rptr. 499, 430 P.2d 57].) As the state admits, two witnesses, Harmon and Dr. Henry Hahnk, testified that the rolled gutter was a cause of the accident. Causation is a question of fact (*Osborn* v. *City of Whittier* (1951) 103 Cal.App.2d 609, 616 [230 P.2d 132]) and there may be more than one legal cause of an accident. (*Vesely* v. *Sager* (1971) 5 Cal.3d 153, 163 [95 Cal.Rptr. 623, 486 P.2d 151].) There was substantial evidence to show the rolled gutter was a cause of the accident.[11]

## IV

 Appellants' claim of inadequate warning is without merit. The evidence shows the two signs were clearly visible and the driver did not see them because he was concentrating on the lane change. There was sufficient evidence of adequate notice or warning to the public.

Thus, even if appellants could show that exceeding the posted speed did not preclude a finding of use of property with due care, the state was still able to show that it had the defense of design immunity.

---

[11]The parties do not raise questions as to whether there was discretionary approval.

The judgment in favor of defendants on the complaint is reversed; the judgment in favor of the state on the cross-complaint is affirmed. Appellants shall recover their costs on appeal.

McClosky, J., and Schneider, J.,* concurred.

A petition for a rehearing was denied October 18, 1983, and the petition of appellants Royster and Harmon for a hearing by the Supreme Court was denied December 22, 1983.

*Assigned by the Chairperson of the Judicial Council.