[No. C000305. Third Dist., Jan. 20, 1988.]

KIMBERLY HEFNER, Plaintiff and Appellant, v.
COUNTY OF SACRAMENTO, Defendant and Respondent.

1008

COUNSEL

Thompson & Dreyer, Robert A. Buccola and Wade R. Thompson for Plaintiff and Appellant.

Bolling, Walter & Gawthrop, George E. Murphy and Marjorie E. Manning for Defendant and Respondent.

OPINION

SIMS, J.—Plaintiff Kimberly Hefner was seriously injured in an automobile accident. She sued (in addition to the driver of the car that collided with hers) Sacramento County (defendant) alleging the defective design of the intersection at which the accident occurred constituted a dangerous condition of property that caused the collision. The trial court granted defendant's motion for summary judgment on the ground it was immune from liability arising out of the defective design of improvements to public property. (Gov. Code, § 830.6; all further statutory references are to the Government Code unless otherwise indicated.)[1] Plaintiff appeals. We shall conclude that the expert opinions of two civil engineers constitute "any substantial evidence upon the basis of which . . . a reasonable public employee could have adopted the . . . design . . . ." (*Ibid.*) We shall therefore affirm the judgment on the ground defendant is entitled to immunity under section 830.6.

FACTS

U Street (later renamed Antelope Road) is a through street running east-west. Don Julio Boulevard runs north-south; its northern terminus is at U Street, where a T-intersection is formed. At the time of the accident, a stop sign was placed on the eastern side of Don Julio some 38 feet south of the edge of the pavement of U Street's eastbound lane. A limit line[2] was painted

---

[1] Section 830.6 provides in pertinent part: "Neither a public entity nor a public employee is liable under this chapter for an injury caused by the plan or design of a construction of, or an improvement to, public property where such plan or design has been approved in advance of the construction or improvement by the legislative body of the public entity or by some other body or employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved, if the trial or appellate court determines that there is any substantial evidence upon the basis of which (a) a reasonable public employee could have adopted the plan or design or the standards therefor or (b) a reasonable legislative body or other body or employee could have approved the plan or design or the standards therefor. . . ."

[2] Where limit lines are present, drivers are required to stop their vehicles before crossing the line. (Veh. Code, § 22450.)

across the northbound lane of Don Julio 13 feet south of the edge of the pavement of U Street's eastbound lane.[3]

On November 7, 1980, plaintiff's automobile was hit broadside by a vehicle driven by Matthew DeWein that had been traveling east on U Street. In her complaint, plaintiff alleged that she had stopped her vehicle at the limit line on Don Julio Boulevard but her view of eastbound traffic was obscured by a mound of dirt and vegetation on the corner across Don Julio (the southwest corner of the intersection). As she pulled beyond the limit line, her car was hit by the vehicle of DeWein, who apparently believed plaintiff was pulling onto U Street in front of him and thus swerved his car to avoid what he thought would be a collision. In fact, plaintiff's car was stopped and DeWein's intended evasive maneuver actually directed his car straight into plaintiff's. Evidence on the motion showed without dispute that DeWein had been drinking alcoholic beverages. Officers investigating the accident found a strong odor of alcohol about DeWein and his vehicle. DeWein's eyes were bloodshot and glassy. A half-empty bottle of beer was found on the floorboard of the driver's side of the vehicle.

With respect to defendant, the foundation of plaintiff's complaint was that placement of the limit line in a spot where a driver's visibility was obscured created a dangerous condition at the intersection. Defendant moved for summary judgment on grounds that the facts failed to establish a material controversy with respect to the existence of a dangerous condition and, in any event, defendant was immune from liability by virtue of section 830.6.

In support of its design immunity defense, defendant presented declaration evidence outlining the history of construction and approval of the intersection. The evidence showed the intersection was designed by a civil engineer with defendant's Department of Public Works. Because U Street was designated a through street, the plan called for a stop sign to be placed on Don Julio Boulevard at the southeast corner of its intersection with U Street. The plan did not designate placement of the limit line.

After the location of the stop sign was determined, the limit line was painted onto Don Julio Boulevard under the supervision of Jess Lowery, the department's senior traffic supervisor. In his position, Lowery had been delegated discretionary authority to supervise the placement of limit lines within the department's standards. Those standards had been promulgated by James Ray, a civil and traffic engineer with defendant, and were identical

---

[3] Defendant's evidence placed the limit line either eight or thirteen feet from the south edge of U Street. We use 13 feet as the distance more favorable to plaintiff. Sometime following the accident at issue here, the limit line was moved closer to U Street.

to those listed in the United States Department of Commerce Manual on Uniform Traffic Control Devices as well as in the California Department of Transportation Traffic Manual. Copies of these written standards were incorporated in Ray's declaration.

The standards provided that limit lines should be placed no less than four and no more than thirty feet from the nearest edge of the intersecting street. In accordance with the requirements, the limit line was painted across the northbound half of Don Julio Boulevard 13 feet south of the southern edge of U Street.

Ray declared his opinion as a professional registered civil and traffic engineer that placement of the stop sign and limit line was in accord with county, state and national standards as well as consistent with then-prevailing and current standards of design and safety. He stated the limit line was placed and approved "according to reasonably accepted standards and by employees of [defendant] Department of Public Works with authority to make those approvals." In addition, Terry Little, a civil engineer with the Highways and Bridges Division of the Department of Public Works, stated in his declaration that the placement of the stop sign and limit line met reasonable and safe engineering practices and was in accord with all applicable standards. He also stated that sight distances from the intersection met and exceeded all federal, state and local recommendations for intersection sight distances.

Plaintiff opposed the motion for summary judgment and presented the declaration of William Neuman, a civil engineer and professor of engineering at California State University, Sacramento. Neuman stated that the location of the limit line was a dangerous condition because drivers stopped at that spot could not see oncoming traffic, nor could oncoming drivers see them.

The trial court granted defendant's motion for summary judgment on July 3, 1985. Plaintiff moved for reconsideration. In connection with the motion for reconsideration, plaintiff submitted the further declaration of William Neuman. Neuman propounded a two-prong approach to determining the proper placement of the limit line. He declared "The limit line is to be placed where it is safe with adequate visibility within 4 to 30 feet of the fog line [i.e., the edge of the intersecting roadway]." He opined that the limit line at the intersection of U Street and Don Julio Boulevard failed to meet this guideline. He also asserted an engineering evaluation was required to determine whether placement of the limit line was proper and that no such evaluation had taken place. He stated no reasonable employee or public entity could have approved the location of the limit line. He also

insisted the failure to place the limit line at a location with adequate visibility of oncoming traffic created a trap wherein a car slowly pulling past the limit line to ascertain whether it was safe to enter U Street would be perceived by drivers of oncoming cars as actually attempting to enter U Street, thereby forcing those oncoming drivers to take evasive action.

After reconsideration, the trial court again granted summary judgment in favor of defendant. This appeal followed.

## DISCUSSION

### I. Design Immunity

At the risk of jumping over the duty horse into the immunity cart (see *Williams* v. *State of California* (1983) 34 Cal.3d 18, 22 [192 Cal.Rptr. 233, 664 P.2d 137]), we shall assume for purposes of argument there exists a triable issue of fact whether defendant's duty to prevent accidents caused by dangerous conditions on public property was breached by the design of the subject intersection. Because the trial court ruled that defendant was immune pursuant to section 830.6, and because we find that issue dispositive, we need consider only that ruling.

■ "The rationale behind design immunity 'is to prevent a jury from simply reweighing the same factors considered by the governmental entity which approved the design.' (*Baldwin* v. *State of California* [1972] 6 Cal.3d 424, 432, fn. 7 [99 Cal.Rptr. 145, 491 P.2d 1121].) ' "[T]o permit reexamination in tort litigation of particular discretionary decisions where reasonable men may differ as to how the discretion should be exercised would create too great a danger of impolitic interference with the freedom of decision-making by those public officials in whom the function of making such decisions has been vested." ' (4 Cal. Law Revision Com. Rep. (1963) p. 823, quoted at [*Cabell* v. *State of California* (1967)] 67 Cal.2d [150,] at p. 153 [60 Cal.Rptr. 476, 430 P.2d 34, 34 A.L.R.3d 1154].)" (*Cameron* v. *State of California* (1972) 7 Cal.3d 318, 326 [102 Cal.Rptr. 305, 497 P.2d 777].)

■ "The 'Design Immunity' defense (Gov. Code, § 830.6) is raised on a motion for summary judgment, nonsuit, and directed verdict. On submitting such matter, the trial court is invited to rule whether the evidence is sufficient to support the design immunity defense, and if the trial court determines that the defense has been established, the jury is instructed that the public entity is immune as a matter of law for design related damages. (*Mozzetti* v. *City of Brisbane* (1977) 67 Cal.App.3d 565 [136 Cal.Rptr. 751].) . . . . [¶] In order for the state to establish design immunity as a defense, the state must show (1) A causal relationship between the plan and the

accident; (2) discretionary approval of the plan prior to construction; (3) substantial evidence supporting the reasonableness of the design. (*Anderson v. City of Thousand Oaks* (1976) 65 Cal.App.3d 82, 88 [135 Cal.Rptr. 127].) ■ The state is entitled to a defense of design immunity if there is any substantial evidence on which the approval can be reasonably based, and it is error to submit a design defense to a jury. (*Mozzetti* v. *City of Brisbane, supra,* 67 Cal.App.3d 565.) For example, a conflict will not create a triable issue of fact to defeat a motion for summary judgment. (*Moritz* v. *City of Santa Clara* (1970) 8 Cal.App.3d 573 [87 Cal.Rptr. 675].) [¶] In determining whether evidence before the trial court is substantial, the question is whether the evidence 'reasonably inspires confidence' and is of 'solid value.' (*Davis* v. *Cordova Recreation & Park Dist.* (1972) 24 Cal.App.3d 789, 798 [101 Cal.Rptr. 358].)" (*Muffett* v. *Royster* (1983) 147 Cal.App.3d 289, 306-307 [195 Cal.Rptr. 73].)

■ For present purposes, there is no dispute that the injury was caused by the design and that the design was approved by an employee (Lowery) exercising discretionary authority.[4] The crux of the dispute is whether the record manifests "any substantial evidence upon the basis of which . . . a reasonable public employee could have adopted the . . . design . . . ." (§ 830.6.)

Preliminarily, we note that defendant has failed to disprove allegations in the complaint that the vision and visibility of those stopped at the limit line were "totally obscured" by a mound of vegetation and dirt. Although the declaration of engineer Terry Little stated that visibility *at the limit line itself* was approximately 2,000 feet and exceeded all standards, defendant presented no evidence showing what visibility was available to the driver of a vehicle, who would necessarily be located at least several feet behind the limit line. Accordingly, we assume that a driver stopped at the limit line in question could not see vehicles approaching on U Street, nor could drivers on U Street see a vehicle stopped at the limit line in question.

Nonetheless county engineers Ray and Little testified in their declarations that placement of the limit line met all national and state standards for design and safety, which required placement of a limit line between four and thirty feet from an intersecting roadway. Little further testified that placement of the limit line met reasonable and safe engineering practices. According to Ray, lack of visibility at the limit line violated no standards because, "There is no National, State or County standard which requires any sight distance from the limit line." Standards *do* require visibility from

[4]Lowery was not a licensed engineer. However, the statute imposes no requirement that the employee exercising discretionary authority be a licensed engineer or architect. (*Thomson* v. *City of Glendale* (1976) 61 Cal.App.3d 378, 385 [132 Cal.Rptr. 52].)

a point located 11 feet from the edge of the intersecting roadway; however, visibility at the intersection in question far exceeded those standards.[5]

Ordinarily, the opinion of a civil engineer as to the reasonableness of a design constitutes "any" substantial evidence sufficient to support a design immunity defense under section 830.6. (See, e.g., *Becker* v. *Johnston* (1967) 67 Cal.2d 163, 173 [60 Cal.Rptr. 485, 430 P.2d 43], overruled on other grounds in *Baldwin* v. *State of California* (1972) 6 Cal.3d 424, 439 [99 Cal.Rptr. 145, 491 P.2d 1121]; *Muffett* v. *Royster, supra,* 147 Cal.App.3d at p. 307.) However, appellate courts have rejected expert testimony ostensibly supporting design immunity where the testimony has been flawed sufficiently to destroy its substantiality.

Thus, for example, in *Davis* v. *Cordova Recreation & Park Dist.* (1972) 24 Cal.App.3d 789 [101 Cal.Rptr. 358], this court rejected the testimony of an expert supporting the reasonableness of the design of a pond in a public park. The pond was generally shallow but featured a deeper hole in the middle that provided a breeding environment for fish. A child waded into the pond, became submerged in the "fish hole," and ultimately died. Defendant's expert testified that since the purpose of the pond was aesthetic, its "fish hole" design was reasonable. (P. 797.) However, this court concluded the expert's opinion disregarded the *actual use* of the design by children who were known to have gone into the pond. (Pp. 798, 800.) The expert's opinion that disregarded actual use was therefore insubstantial. (P. 798.) No comparable weakness in the experts' opinions exists in this case.

An expert engineering opinion was also disregarded in *Levin* v. *State of California* (1983) 146 Cal.App.3d 410 [194 Cal.Rptr. 223], where the court concluded the state had violated its own design standards by failing to install a guardrail. (Pp. 417-418.)[6] Here, plaintiff contends defendant's placement of the limit line also violated its own design standards. In his declaration, plaintiff's expert, Neumann, testified summarily that the Manual for Uniform Traffic Control Devices required a limit line to be placed "where it is safe *with adequate visability* [sic] within 4 to 30 feet of the fog line." (Italics added.) However, the trial court had copies of the manual in evidence, including excerpts attached to Neumann's declaration. No language in the manual supported Neumann's view that it required adequate

[5] This case is therefore distinguishable from *Feingold* v. *County of Los Angeles* (1967) 254 Cal.App.2d 622 [62 Cal.Rptr. 396], where the plaintiff alleged that drivers entering an intersection were unable to see one another (because of the topography of land at the intersection) until *after* they had committed themselves to entering the intersection, even if they obeyed posted stop signs. (*Id.,* at pp. 625-626.) Here, the evidence was uncontradicted that a driver on Don Julio could observe traffic *before* entering U Street.

[6] Since *Levin* is distinguishable, we have no occasion in this case to determine whether we think it is correctly decided.

visibility from a limit line. The trial court so concluded. We think the trial court was entitled to disregard Neumann's opinion as to the standards set forth in the manual on the ground that the manual, and not Neumann's view of it, constituted the best evidence of its contents. (See Evid. Code, § 1500.) The manual simply does not include visibility as a design standard for placement of limit lines.

Plaintiff also argues defendant violated its own county standard. This argument is premised on Ray's statement, in his declaration, that a limit line must be placed "*at a safe stopping point,* not less than four nor more than 30 feet from the edge of pavement of the nearest cross street." (Italics added.) Plaintiff contends the limit line in this case was not "a safe stopping point" because visibility was impaired. According to plaintiff's expert, Neumann, the vice in such placement of the limit line is that a motorist must first stop behind the limit line, then proceed to where visibility exists. "This, in my opinion," declared Neumann, "creates an unexpected condition for roadways in this region. The oncoming motorist will automatically be placed in a situation where the entering vehicle appears to be proceeding without stopping or in disregard of oncoming traffic. The driver of the through vehicle is faced with an illusion that is life threatening and creates a dangerous condition on the roadway and forces that driver to take evasive action which in reality is unnecessary."

We do not believe Neumann's testimony was sufficient to cause the trial court to conclude that the testimony of Ray and Little was insubstantial. The practice of stopping at a limit line and then "creeping" forward to a point of visibility has long been recognized as "practical" under California law. (See *Smith* v. *Pellissier* (1955) 134 Cal.App.2d 562, 570 [286 P.2d 66].) There are many reasons why a limit line would be placed where visibility of oncoming traffic might be impaired. Trolly or railroad tracks could require the limit line to be set back from the intersection. Or (as anyone who has driven in San Francisco would understand), many times the limit line is placed below the crest of a steep hill to avoid a pedestrian crosswalk, requiring the driver to cross the limit line before he or she can tell whether it is safe to proceed further. We also note that the danger posited by plaintiff—the appearance of a vehicle entering the roadway without stopping— could well be present if the limit line were placed where a vehicle stopped behind it would be visible to drivers on the intersecting roadway. This is so because the vehicle coming to a stop behind the limit line would necessarily be moving before it reached the limit line. Finally, we note that placement of the limit line closer to the intersection leaves less margin for driver error in stopping and increases the risk that a driver running the limit line will precipitously enter the intersection. In the circumstances, we are loath to

impose on the highway design profession a design requirement—visibility from a limit line—not found in its standards.

Plaintiff also argues "creeping" past a limit line requires drivers to violate Vehicle Code section 22450. That section states as relevant here, "The driver of any vehicle approaching a stop sign at the entrance to . . . an intersection . . . shall stop at a limit line, . . ."

Plaintiff construes this section to prohibit a driver properly stopped at the limit line from moving forward until he or she may enter an intersecting roadway with safety. However, nothing in the language of the statute makes unlawful the act of moving past the limit line if the driver first stops there.

Keeping in mind that our task is merely to determine whether the record manifests "any substantial evidence" on the basis of which a reasonable employee could have adopted the design (§ 830.6), we conclude the testimony of engineers Ray and Little, stating that placement of the limit line satisfied all established design criteria and safe engineering practices, constitutes substantial evidence sufficient to justify Lowrey's placement of the limit line for purposes of section 830.6. (*Muffett* v. *Royster, supra,* 147 Cal.App.3d at p. 307.) The trial court properly concluded defendant was entitled to design immunity.

## II.   *Trap*

Plaintiff also argues that the allegedly defective design of the intersection created a "trap" which would override any immunity provided by section 830.6. Under section 830.8,[7] an entity can be liable for its failure to warn of a dangerous condition that causes harm.

█   " 'By force of its very terms the design immunity of section 830.6 is limited to a design-caused accident. [Citation.] It does not immunize from liability caused by negligence independent of design, even though the independent negligence is only a concurring, proximate cause of the accident.' (*Flournoy* v. *State of California* [1969] 275 Cal.App.2d 806, 811 [80 Cal.Rptr. 485], fn. omitted.)" (*Cameron* v. *State of California, supra,* 7 Cal.3d at p. 328.) "[W]here the state is immune from liability for injuries caused by a dangerous condition of its property because the dangerous

---

[7]Section 830.8 provides: "Neither a public entity nor a public employee is liable under this chapter for an injury caused by the failure to provide traffic or warning signals, signs, markings or devices described in the Vehicle Code. Nothing in this section exonerates a public entity or public employee from liability for injury proximately caused by such failure if a signal, sign, marking or device (other than one described in Section 830.4) was necessary to warn of a dangerous condition which endangered the safe movement of traffic and which would not be reasonably apparent to, and would not have been anticipated by, a person exercising due care."

condition was created as a result of a plan or design which conferred immunity under section 830.6, the state may nevertheless be liable for failure to warn of this dangerous condition where the failure to warn is negligent and is an independent, separate, concurring cause of the accident." (*Id.,* at p. 329.)

■ However, as plaintiff acknowledges in her brief, the so-called "trap" exception applies only when it is alleged that the entity failed to post adequate signs warning of a dangerous condition. (See, e.g., *Cameron* v. *State of California, supra,* 7 Cal.3d 318 [failure to warn of road's hazardous uneven banking]; *Flournoy* v. *State of California, supra,* 275 Cal.App.2d 806 [failure to warn of icy bridge]; *Feingold* v. *County of Los Angeles* (1967) 254 Cal.App.2d 622 [62 Cal.Rptr. 396] [failure to warn of blind intersection].) Plaintiff also concedes this case does not present the issue of defective or inadequate warning signs; instead, she hopes to circumvent immunity based only on Neuman's declaration that the intersection design itself presented a trap. We need not examine this doctrine in detail, because absent a claim that warning signs are inadequate, the "trap" exception to governmental immunity is inapplicable. (See Van Alstyne, Cal. Government Tort Liability Practice (Cont.Ed.Bar 1980) § 3.40, pp. 251-254.)

## DISPOSITION

The judgment is affirmed.

Puglia, P. J., and Deegan, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied March 30, 1988.

---

* Retired judge of the superior court sitting under assignment by the Chairperson of the Judicial Council.