[Civ. No. 12636. Third Dist. Apr. 6, 1972.]

LARRY E. DAVIS, SR., et al., Plaintiffs and Appellants, v.
CORDOVA RECREATION AND PARK DISTRICT,
Defendant and Respondent.

## COUNSEL

Zane Vorhes for Plaintiffs and Appellants.

Rust & Mills and William A. Mayhew for Defendant and Respondent.

## OPINION

**RICHARDSON, P. J.**—Plaintiffs sued defendant Cordova Recreation and Park District for damages following the death of their 4-year-old son, Larry E. Davis, Jr. Defendant's answer did not allege the design immunity defense. After denial by the trial court of motions for nonsuit and during the defense presentation, the court announced that it found the defense of design immunity established. It then directed judgment for defendant, excused the jury and, over objection, permitted the amendment of defendant's answer to include the defense of design immunity to conform with proof. The court then signed findings of fact and conclusions of law wherein it found that before the date of death the design for construction of a certain lake or pond designated as "Cordova Lane Park Lagoon" was approved by the board of directors of defendant and that the design was prepared by an architect in conformity with standards previously approved by the board; and as a conclusion of law, the court determined that "as a matter of law . . . there was substantial evidence upon the basis of which the Board of Directors of CORDOVA RECREATION AND PARK DISTRICT acted reasonably in the approval of the plan and design of the CORDOVA LANE PARK LAGOON."

Plaintiffs contend, first, that the trial court erred in granting defendant's motion to amend its answer permitting assertion of the design immunity defense; second, that plaintiffs did not waive their right to object to such amendment; and third, that the evidence did not establish the defense of design immunity.

### Facts

Larry E. Davis, Jr., a 4-year-old boy, lived with his parents, plaintiffs herein, and a 5-year-old sister, in the Rancho Cordova suburb of Sacramento. The Davis residence was located approximately 150 yards from Cordova Lane Park, which was owned and maintained by defendant for the use and enjoyment of the public. On many occasions the Davis family had used the park, plaintiff-father and the Davis children frequently playing kickball there. Centrally located in the park is a body of water variously described as a pond, lagoon, or lake, irregular in shape and bordered on the north, west and south by lawn areas. The lake's perimeter on its northwest and south sides is marked by a flat cement walkway, level with the lawn area, and elevated a few inches above the water. Around the entire perimeter of the lake the surrounding lawn slopes directly toward the water.

The neighborhood in which the park is situated is inhabited largely by young people and is characterized by the presence of many small children who frequent the park and use its facilities. The evidence established that the purpose of the lake was severalfold: for esthetic purposes, to furnish drainage during the rainy season and to "provide an experience for young children to have an opportunity to fish."

In 1961 defendant adopted a master plan for recreation and parks. Pursuant thereto, an architect was engaged to prepare the detailed plans and specifications for Cordova Lane Park, which in turn were approved by defendant's board of directors. One critical feature of the pond design as approved was a certain "fish hole" or sump to be constructed near the middle of the pond. The purpose of this fish hole was to provide a deeper sanctuary for fish which, otherwise lacking oxygen, would be unable to survive the temperatures of Sacramento summers in the shallow water that characterized the rest of the pond. The dimensions of the fish hole were to be 27½ feet in diameter at the bottom. During construction of the facility, however, and because the area park site was smaller than originally conceived, the dimensions of the hole in question were changed so that its size was reduced. The resultant dimensions were 12 feet in diameter at the top, 6 to 8 feet in diameter at the bottom and 5½ to 6 feet in depth. This alteration was approved during construction by both the defendant's administrator and a supervisor of the defendant. The net effect of this struc-

tural change was to increase substantially the steepness of the sloping side-walls of the hole from 45 degrees as designed to 65 or 80 degrees.

In the late afternoon of July 26, 1968, and while plaintiff-parents were packing preparatory to departure on a vacation trip, young Larry and his sister requested and received permission to play with a neighbor's children who lived two houses closer to Cordova Lane Park. Within 15 to 20 minutes plaintiffs' daughter returned home and excitedly told her parents that "Larry is hiding in the water," referring to the pond in the park. The father raced to the park, could not see his son and commenced wading in the water seeking him. At a point roughly in the center of the lake he "fell" into the fish hole, which he estimated to be 5 feet deep, and therein located his son. The boy was rushed to a hospital after attempted emergency resuscitation but died within 24 hours from irreversible brain damage caused by lack of oxygen.

### Amendment to Answer

Plaintiffs' complaint alleged in two causes of action: first, negligence in knowingly causing, maintaining and failing to remedy a dangerous condition; and secondly, negligence in maintaining a dangerous condition likely to trap and harm small children. Plaintiffs assert prejudice and surprise by reason of the permission given to defendant to amend its answer to incorporate the defense of design immunity; further, that they did not waive the right to object to the amendment; and finally, that the evidence supporting defendant's immunity by virtue of an approved design lacked substantiality.

The only affirmative defense raised in the answer was contributory negligence. The pretrial conference order did not recite the specific issues. After the opening statement of plaintiffs, defendant's motion for nonsuit was denied. On the second day of trial, in the absence of the jury and after testimony of expert witnesses for both sides on the issue of the design immunity defense, a renewed motion for nonsuit again was denied. The jury was reconvened and plaintiffs' expert again testified. After plaintiffs rested, defendant's motion for a directed verdict was denied, as was a third motion for nonsuit. Defendant then presented before the jury its expert, and at the conclusion of his testimony the court held that the defense of design immunity pursuant to Government Code section 830.6 had been established and "direct[ed] that the Defendant have judgment against the Plaintiffs," that defendant prepare findings, that the jury be excused, and that defendant have "permission to amend its answer to conform with proof."

Plaintiffs did not object at the argument of the various motions for nonsuit and directed verdict as to the timeliness of asserting the design immu-

nity defense. A review of the record herein indicates that plaintiffs had anticipated the design immunity defense, and from opening statement on were directing their case in a manner to defeat it by exploiting the variance between the facility as originally conceived, designed and approved and that which was ultimately constructed. ■ As was said in *Duncan* v. *Sunset Agricultural Minerals* (1969) 273 Cal.App.2d 489, 494 [78 Cal.Rptr. 339]: "It has long been settled law that where (1) a case is tried on the merits, (2) the issues are thoroughly explored during the course of the trial and (3) the theory of the trial is well known to court and counsel, the fact that the issues were not pleaded does not preclude an adjudication of such litigated issues and a review thereof on appeal." (See also *Pacific Finance Corp.* v. *Foust* (1955) 44 Cal.2d 853, 858 [285 P.2d 632]; *Hollypark Realty Co.* v. *MacLoane* (1958) 163 Cal.App.2d 549, 552 [329 P.2d 532].) ■ Furthermore, "It is a well-known policy of the law to permit amendments of pleadings liberally in order that litigation may be tried on its merits." (*Cardenas* v. *Ellston* (1968) 259 Cal.App.2d 232, 238 [66 Cal.Rptr. 128].)

■ We find no merit in the first two contentions of plaintiffs and find the trial court's action proper in considering the defense of design immunity notwithstanding the failure of defendant's answer initially to assert it. We address ourselves to the final and, in our view, most critical question in the case before us.

### Did the Evidence Establish the Defense of Design Immunity?

We have said recently with reference to the defense of design immunity that "The defense held out by section 830.6 rests upon a combination of three statutory elements: first, a causal relationship between the plan or design and the accident; second, the design's approval in advance of construction by a legislative body or officer exercising discretionary authority; third, a court finding of substantial evidence of the design's reasonableness." (*Johnston* v. *County of Yolo* (1969) 274 Cal.App.2d 46, 51-52 [79 Cal.Rptr. 33].) ■ It is well established that defendant has the burden of pleading and proving the defense of design immunity and each of the essential elements of it. (*Hilts* v. *County of Solano* (1968) 265 Cal. App.2d 161, 175 [71 Cal.Rptr. 275]; *Johnston* v. *County of Yolo, supra,* at p. 50.) We turn immediately to the third essential component, a finding that substantial evidence supports the reasonableness of the design. In doing so, we pass an intermediate and serious question of whether the two employees of defendant, namely, Mr. Hagan, the administrator of defendant, and Mr. Fente, a supervisor of defendant, were vested with the discretionary authority to change or alter the plans or design of the pond,

and particularly the fish hole. This change, characterized by the trial court as "trivial," is, in our view, material and significant.

Government Code sections 830[1] and 835[2] establish the standards applicable to liability of a  public entity for the dangerous condition of property. These companion sections consist of a part of the extensive California Tort Claims Act of 1963. (Gov. Code, § 814 et seq.) The governmental liabilities established by the act are limited by its immunities (Gov. Code, § 815, subd. (b)), and of special concern to our consideration herein, by section 830.6,[3] the design immunity section.

■ Government Code section 835 expresses the basic liability of the entity for injury caused by a "dangerous condition" of public property, and in subdivision (a) provides for liability where the public entity through its employee has created the dangerous condition. (See *Flournoy v. State of California* (1969) 275 Cal.App.2d 806, 808 [80 Cal.Rptr. 485].) This

---

[1]Section 830 reads: "As used in this Chapter:

"(a) 'Dangerous condition' means a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used.

"(b) 'Protect against' includes repairing, remedying or correcting a dangerous condition, providing safeguards against a dangerous condition, or warning of a dangerous condition.

"(c) 'Property of a public entity' and 'public property' mean real or personal property owned or controlled by the public entity, but do not include easements, encroachments and other property that are located on the property of the public entity but are not owned or controlled by the public entity."

[2]Section 835 reads: "Except as provided by statute, a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:

"(a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or

"(b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."

[3]Section 830.6 reads: "Neither a public entity nor a public employee is liable under this chapter for an injury caused by the plan or design of a construction of, or an improvement to, public property where such plan or design has been approved in advance of the construction or improvement by the legislative body of the public entity or by some other body or employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved, if the trial or appellate court determines that there is any substantial evidence upon the basis of which (a) a reasonable public employee could have adopted the plan or design or the standards therefor or (b) a reasonable legislative body or other body or employee could have approved the plan or design or the standards therefor."

section must be viewed in conjunction with Government Code section 830 defining "dangerous condition" as a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used.

In this connection interpretative comment of the Law Revision Commission on this section is enlightening. Such comments are well accepted sources from which to ascertain legislative intent. (*Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 630 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R. 3d 420].) Such comment reads in part: "A condition is not dangerous within the meaning of this chapter unless it creates a hazard to those who foreseeably will use the property or adjacent property with due care. Thus, even though it is foreseeable that persons may use public property without due care, a public entity may not be held liable for failing to take precautions to protect such persons. The definition would, however, take into consideration the standard of care that would be applicable to foreseeable users of the property. Where it is reasonably foreseeable that persons to whom a lower standard of care is applicable—such as children—may be exposed to a substantial risk of injury from the property, the public entity should be required to take reasonable precautions to protect such persons from that risk. Thus, a public entity may be expected to fence a swimming pool or to fence or lock up a dangerous instrumentality if it is reasonably foreseeable that small children may be injured if such precautions are not taken." (See also *Akins* v. *County of Sonoma,* 67 Cal.2d 185, 196 [60 Cal.Rptr. 499, 430 P.2d 57].)

Our consideration of the evidence before the trial court insofar as it relates to the matter of reasonable forseeability of injury bears on the issue of liability as imposed by section 835, and also on the defense of design immunity as defined in section 830.6. A consideration of the provisions of section 835.4[4] also is helpful in measuring the conduct of the parties within the factual context presented to the trial court. Similarly, the

---

[4]Section 835.4 reads: "(a) A public entity is not liable under subdivision (a) of Section 835 for injury caused by a condition of its property if the public entity establishes that the act or omission that created the condition was reasonable. The reasonableness of the act or omission that created the condition shall be determined by weighing the probability and gravity of potential injury to persons and property foreseeably exposed to the risk of injury against the practicability and cost of taking alternative action that would not create the risk of injury or of protecting against the risk of injury.

"(b) A public entity is not liable under subdivision (b) of Section 835 for injury caused by a dangerous condition of its property if the public entity establishes that the action it took to protect against the risk of injury created by the condition or its failure to take such action was reasonable. The reasonableness of the action or inaction of the public entity shall be determined by taking into consideration the time and opportunity it had to take action and by weighing the prob-

explanation of the Law Revision Commission on this section is revealing: "Under this section, a public entity may absolve itself from liability for creating or failing to remedy a dangerous condition by showing that it would have been too costly and impractical for the public entity to have done anything else.

"This defense has been provided public entities in recognition that, despite limited manpower and budgets, there is much that they are required to do. Unlike private enterprise, a public entity often cannot weigh the advantage of engaging in an activity against the cost and decide not to engage in it. Government cannot 'go out of the business' of governing. Therefore, a public entity should not be liable for injuries caused by a dangerous condition if it is able to show that under all the circumstances, including the alternative courses of action available to it and the practicability and cost of pursuing such alternatives, its action in creating or failing to remedy the condition was not unreasonable."

The trial court heard from several witnesses a recitation of the circumstances surrounding the death of Larry Davis, Jr., as briefly summarized above. Testimony directed to the adoption of the plan and design of the lake and fish hole was also presented. The court then heard from two experts, a Mr. Kenneth Anderson for plaintiff and a Dr. Seymour Gold for defendant. Dr. Gold, an associate professor of environmental planning at the University of California at Davis, had extensive experience in the professional practice of recreation planning and teaching. He inspected the park in question and the plans therefor and concluded that the lake was used "quite heavily" for fishing, but that this would be its secondary use, its primary purpose being esthetic. Dr. Gold described the pool as one of good design, not intended for swimming or wading, and concluded that a reasonable park board would not be concerned with the "slope of a fish hole" in a lagoon designed primarily for esthetic and secondarily for fishing purposes. The essential thrust of his testimony was that since the pool had an esthetic purpose, the slope design and location of the fish hole was of no moment and not predictably hazardous. It was not intended that persons should be in the vicinity of the hole. A pool intended primarily for wading or swimming would have, in Dr. Gold's view, a different design in terms of size, depth, nature of the surface of the bottom, enclosure and warnings. Because the plan contemplated a pond pleasing to the eye and appealing esthetically, with the only close activity limited to fishing, presumably from the shore, it was not in his view reasonably predictable that persons would venture physically in the vicinity of the fish hole.

ability and gravity of potential injury to persons and property foreseeably exposed to the risk of injury against the practicability and cost of protecting against the risk of such injury."

The trial court, accepting such testimony, found the establishment of the design immunity.

In determining whether the evidence before the trial court was "substantial" we are aided by a definition contained in *People* v. *Bassett* (1968) 69 Cal.2d 122, 139 [70 Cal.Rptr. 193, 433 P.2d 777], wherein the Supreme Court described such evidence as that which "reasonably inspires confidence" and is of "solid value." Bearing in mind that the test is whether any substantial evidence supported the finding that the design was reasonable, we have concluded that there was no such substantial evidence and that the trial court erred in its determination that the design immunity was so supported and so established herein.

From the record before the trial court we note the following: The park in question was constructed in a new residential area with predominantly young families characterizing the neighborhood. The park itself and the lake in particular were inviting to small children. Defendant's expert found that a secondary purpose of the lake was to "provide an experience for young children to have the opportunity to fish." The park was intended to be and was located in close proximity to an elementary school, thus providing a recreational opportunity for children attending kindergarten through sixth grade. A Little League baseball diamond was relatively near as was a nursery school. The park and the lake were described by testimony as a recreational focal point for "little kids anywhere from babies, infants to ten, eleven years old." A neighbor described the pond as a lure for her small child because of the presence of "frogs and pollywogs." The park and area around the lake was described by defendant's expert as used "quite heavily" and for "fishing, basically." The configuration of the park was such that the grassy play areas surrounded the lake and sloped uniformly downhill toward the lake. The lake was generally shallow, ranging from 3 to 4 inches to about knee deep on an adult. The bottom was covered with large rocks and was "real slimy" from the collection of algae, and the lake bottom was largely obscured.

One of the frequent children's activities at the park was kickball, usually played "at the bottom right of the pond because of the ball diamond. They were playing hardball all the time." During the kickball games played by Larry and plaintiff-father, the ball had rolled into the water several times. Plaintiff-father would wade into the lake to retrieve the ball.

The accident occurred in late July, and presumably the temperature was warm. Children were known to have gone into the pond, with fishing being a primary activity. Park maintenance personnel were, in fact, instructed as to their course of conduct upon discovering children in the

lake. They were to "get them out and explain the dangers not only of drowning or any broken glass . . . ." The area around the lake was neither fenced nor posted.

In the context of the foregoing, no substantial evidence was presented which would warrant, or support as reasonable, the design or construction of a fish hole in the bottom of the lake with sides sloping at an elevation of 80 degrees from the bottom and which constituted an unguarded and abrupt drop in the level of the lake floor to a depth of 5½ feet. Such a design or construction was aptly described by the trial court as a "trap," and we agree.

Nor is it an answer to urge, as defendant and its expert apparently do, that the immunity exists because the design was obviously esthetic rather than for wading or swimming purposes. Such a contention is not persuasive. We are required by Government Code section 830.6 to measure the facility by the standard of reasonableness. In doing so, we must look, not only to the plan but to the practice, not only to the artistic and architectural conception on the drawing board, but to the facility "in being" and in reality. We think it quite possible for a facility conceived and constructed for artistic and esthetic purposes alone to become in use demonstrably and openly recreational. Thus, the adult or child, contemplated originally as an observer, may become, rather, a participant. In this connection, also, we take note of the fact that water in depth is as wet and hazardous in a pond designed for esthetic purposes as in one wholly designed for recreational swimming. Water in a pond or lake appeals to children as it does to adults, who, however, approach with caution born of wisdom and experience.

The almost endless variants in the mind of a child confronted by a body of water, whether in untangling a fishline, or sailing a boat, or chasing an errant ball, or observing a drifting leaf, or catching a pollywog, are facts of life known to every parent. This court in determining reasonableness will not ignore such knowledge, nor, we think, can the planners of parks frequented by children.

The immunity cannot be supported by an argument that to erect fences or post signs would do artistic violence to the general scheme. For here, if the lake began conceptually as a thing of visual beauty alone, it soon became more. It became a plaything of children in which they enmeshed themselves, and into the perimeter of which they strayed for varying purposes. This conclusion is supported by the oral testimony of witnesses on both sides and by the pictorial evidence as well. In any reasonable scale of values, the risk and hazard herein involved, which in our view could

properly be anticipated, far outweighed the cost of safeguard. The record before us reflects no evidence that unsightly signs or fences would either have been effective or indeed needed. Other safeguards around the fish hole were available and should have been used.

Additionally, we note that the recent Supreme Court decision of *Baldwin* v. *State of California* (1972) 6 Cal.3d 424 [99 Cal.Rptr. 145, 491 P.2d 1121], has cautioned public entities that design immunity may not inure in perpetuity to their improvements when changed physical conditions disclose that they constitute a danger to the public. An analogy can be drawn to the instant case: changed physical conditions did not cause an otherwise safe improvement to become a hazard, but rather, a different use than that which was contemplated by the park designers made the fish hole a hazard to small children. Presumably, therefore, the availability and use of this pond by children, which we have summarized above, should have acquainted the defendant with the fact that the unguarded fish hole constituted a dangerous condition, even though the original adoption of the plan was predicated on a lake designed for esthetic purposes. To permit defendant to avail itself of the design immunity defense by pointing to the lake's alleged esthetic purpose would do violence to the liberal construction of the Tort Claims Act which the Supreme Court most recently emphasized in *Baldwin* v. *State of California, supra,* at pages 435-436.

By virtue of section 835.4 we are adjured, in determining the reasonableness of defendant's action herein, to weigh both "the probability and gravity of potential injury to persons and property foreseeably exposed to the risk of injury against the practicability and cost of taking alternative action." This we do and find the risk of injury relatively great and the cost of protection relatively small.

In summary, we conclude that defendant had actual knowledge of the concentration of young children engaging in activity which made the construction and maintenance of an open, abrupt and unguarded hole in this pond dangerous, hazardous and of high risk, and that no substantial evidence was introduced in support of the reasonableness of this part of the facility. Accordingly, the defense of design immunity on the basis of the evidence before the trial court must fail.

By our holding herein, we go no further than to determine that the trial court committed reversible error in its conclusion that the defense of design immunity had been established. The resolution of the causes of action presented by the complaint and the presence or absence of defenses are

matters for the determination of the court to which we now remand the case.

Judgment reversed.

Janes, J., and Taylor (Warren), J.,* concurred.

---

*Assigned by the Chairman of Judicial Council.