[Civ. No. 23282. Third Dist. Mar. 26, 1985.]

GAIL PIERCE et al., Plaintiffs and Appellants, v.
PACIFIC GAS AND ELECTRIC COMPANY et al.,
Defendants and Respondents.

**COUNSEL**

Trezza, Ithurburn & Steidlmayer, Betrand F. Ithurburn and Mark G. Steidlmayer for Plaintiffs and Appellants.

Robert L. Bordon, David H. Fleisig and David W. Anderson for Defendants and Respondents.

**OPINION**

**SIMS, J.**—In this indisputably shocking case we hold that a consumer, who was injured when a mechanical failure in an electric utility transformer sent 7,000 volts of electricity into her home, may state a cause of action against Pacific Gas and Electric Company (PG & E) for strict liability in tort.

## FACTUAL AND PROCEDURAL BACKGROUND

A lightning storm struck the Meridian area of Sutter County on the afternoon of November 21, 1978. Several PG & E power transformers were struck and damaged by lightning, including two on plaintiffs' property. Plaintiffs' home lost its electricity.

Plaintiff Gail Pierce summoned PG & E, whose crew arrived at about 1:30 a.m. the morning of November 22. The PG & E crew, working in the rain, removed the lightning-damaged transformers from the pole and lifted their replacements into position. One of the replacements had previously been used at another location and had been removed and stored when it was no longer needed. There was no evidence that the transformer had malfunctioned in its previous location, but the PG & E crew did not test the transformer before connecting it to the powerline.

The PG & E crew made two of the three connections from the 12,000-volt powerline to the top of the transformers without incident, but, as a lineman attempted the third connection, the used transformer exploded in a ball of fire.

Gail observed a bit of smoke coming from the motor area of her freezer and saw a red glow in her storage shed. A fire had started in the shed. Upon closer examination Gail saw that the fire was coming from a propane gas pipe, which had ruptured.

A PG & E employee who was nearby extinguished the fire and told Gail that gas was still coming out of the pipe. He asked, "Where's the shut off valve?" Gail replied that she would go shut it off.

As Gail grasped the propane gas tank's shutoff valve she received a terrible shock. The shock tightened her hand around the valve and she could not let go. At some point, maybe 10 or 20 seconds later, Gail fell or slid onto the propane tank, and the force of the electricity blew her hand free of the valve. Gail tumbled away from the tank and down an embankment about six feet high. She was injured.

Plaintiffs' expert witness testified that the transformer malfunction had energized their house wiring, designed for 120 and 240 volts, with approximately 7,000 volts. Postaccident investigation revealed poorly insulated wiring and a ground wire unlawfully connecting plaintiffs' electrical system to the propane gas system.

Plaintiffs filed this action on August 28, 1979, alleging negligence and strict liability in tort for defective products. Plaintiffs' second cause of ac-

tion for products liability alleged that PG & E was "engaged in the business of designing, manufacturing, distributing, selling, leasing, renting, to the general public electrical equipment, including the particular equipment involved in this matter." Plaintiffs' complaint did not identify the electricity itself as a defective product. PG & E answered, and plaintiffs have never amended their complaint.

The case was tried before a jury, and after plaintiffs rested PG & E moved for a nonsuit on the issue of products liability. Plaintiffs responded with a motion for directed verdict. Plaintiffs' motion was premised on theories of (1) strict products liability, (2) absolute liability for ultrahazardous activity, and (3) breach of implied warranty of fitness for particular purpose. The latter two theories were not contained in plaintiffs' pleadings and were not advanced until the date of the motion (June 20, 1983), nearly four years after the case was originally filed.

After both sides rested the trial court denied plaintiffs' motion for directed verdict and granted PG & E's motion for nonsuit.

The case went to the jury on the negligence cause of action, and the jury found by special verdict that PG & E was not negligent. Judgment was entered for PG & E. Plaintiffs' motions for judgment notwithstanding the verdict and new trial were denied, and plaintiffs filed a timely notice of appeal.

## DISCUSSION

### I

We first consider the trial court's entry of nonsuit on plaintiffs' second cause of action for products liability.

"A motion for nonsuit allows a defendant to test the sufficiency of the plaintiff's evidence before presenting his or her case. Because a successful nonsuit motion precludes submission of plaintiff's case to the jury, courts grant motions for nonsuit only under very limited circumstances. (*Campbell* v. *General Motors Corp.* (1982) 32 Cal.3d 112, 117 [184 Cal.Rptr. 891, 649 P.2d 224].) A trial court must not grant a motion for nonsuit if the evidence presented by the plaintiff would support a jury verdict in the plaintiff's favor. (*Id.* at pp. 117-118; *Ewing* v. *Cloverleaf Bowl* (1978) 20 Cal.3d 389, 395 [143 Cal.Rptr. 13, 572 P.2d 1155.)

" 'In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the

evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give "to the plaintiff['s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff['s] favor . . . ."' (*Campbell* v. *General Motors Corp., supra,* 32 Cal.3d at p. 118, quoting *Elmore* v. *American Motors Corp.* (1969) 70 Cal.2d 578, 583 [75 Cal.Rptr. 652, 451 P.2d 84, 33 A.L.R.3d 406]; accord *Ewing* v. *Cloverleaf Bowl, supra,* 20 Cal.3d at p. 395; *Estate of Lances* (1932) 216 Cal. 397, 400 [14 P.2d 768].)

■ "In an appeal from a judgment of nonsuit, the reviewing court is guided by the same rule requiring evaluation of the evidence in the light most favorable to the plaintiff. 'The judgment of the trial court cannot be sustained unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law.' (*Mason* v. *Peaslee* (1959) 173 Cal.App.2d 587, 588 [343 P.2d 805]; accord *Miller* v. *Los Angeles County Flood Control Dist.* (1973) 8 Cal.3d 689, 699 [106 Cal.Rptr. 1, 505 P.2d 193]; *Hughes* v. *Oreb* (1951) 36 Cal.2d 854, 857 [228 P.2d 550].)" (*Carson* v. *Facilities Development Co.* (1984) 36 Cal.3d 830, 838-839 [206 Cal.Rptr. 136, 686 P.2d 656].)

■ Plaintiffs' second cause of action was premised on the theory of strict liability in tort for defective products. Under this theory "A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." (*Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]; see *Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 406 [185 Cal.Rptr. 654, 650 P.2d 1171].) Undisputed evidence at trial established that the defective transformer was manufactured not by PG & E but by Federal Pacific Electric Company, and that PG & E never placed the transformer "on the market" or in the stream of commerce. PG & E was, in essence, a consumer rather than a manufacturer of the transformer, and cannot be held strictly liable in tort for the transformer's defects per se. (*Price* v. *Shell Oil Co.* (1970) 2 Cal.3d 245, 258 [85 Cal.Rptr. 178, 466 P.2d 722].)

■ Evidence presented at trial also established, however, that PG & E's electricity arrived at plaintiffs' home at nearly 60 times its in-

tended voltage,[1] ultimately causing Gail to suffer bodily injury. Plaintiffs contend that household electricity must be considered a product for strict liability purposes, that their evidence was sufficient to support a verdict in their favor, and that the entry of nonsuit was therefore erroneous. (*Carson* v. *Facilities Development Co., supra,* 36 Cal.3d at pp. 838-839.)

Before we consider the merits of plaintiffs' contention, however, we must confront two jurisdictional and procedural obstacles raised by PG & E.

█ PG & E contends a "determination" that it can be held strictly liable in tort is beyond the jurisdiction of this court because it would contradict an order of the Public Utilities Commission (PUC), whose decisions are reviewable only by our highest court. (Pub. Util. Code, § 1759; *Waters* v. *Pacific Telephone Co.* (1974) 12 Cal.3d 1, 4 [114 Cal.Rptr. 753, 523 P.2d 1161].) PG & E asserts the PUC has shielded it from liability for nonnegligent acts in rule 31.1 of General Order No. 95, as set out in the margin.[2] PG & E's argument, although ingenious, is totally without merit.

It has long been acknowledged that the PUC has the power, by rule, to limit the liability of utilities subject to PUC regulation and supervision. (*Waters* v. *Pacific Telephone Co., supra,* 12 Cal.3d at pp. 6, 10; *Cole* v. *Pacific Tel. & Tel. Co.* (1952) 112 Cal.App.2d 416, 417 [246 P.2d 686]; *Davidian* v. *Pacific Tel. & Tel. Co.* (1971) 16 Cal.App.3d 750, 757, fn. 3 [94 Cal.Rptr. 337].)

Although the PUC is empowered to limit utilities' liability, we conclude it has not done so in rule 31.1. Rule 31.1 provides that electrical supply

---

[1]Thus, the electricity was "defective," as that term is used in strict tort liability cases. "In general, a manufacturing or production defect is readily identifiable because *a defective product is one that differs from the manufacturer's intended result* or from other ostensibly identical units of the same product line." (*Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413, 429 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1], italics added.) It is undisputed that 120-240 volts was the voltage normally distributed to residential consumers and was the voltage plaintiffs actually purchased for their house. (See *Ransome* v. *Wisconsin Elec. Power Co.* (1979) 87 Wis.2d 605 [275 N.W.2d 641, 649].) It goes without saying that 7,000 volts was far in excess of PG & E's intended result and in excess, as well, of plaintiffs' reasonable expectations. Moreover, the electricity actually delivered was unsafe. "When a product fails to satisfy . . . ordinary consumer expectations as to safety in its intended or reasonably foreseeable operation, a manufacturer is strictly liable for resulting injuries." (*Barker* v. *Lull Engineering Co., supra,* 20 Cal.3d at p. 430, and cases cited.)

[2]"Electrical supply and communication systems shall be of suitable design and construction for their intended use, regard being given to the conditions under which they are to be operated, and shall be maintained in a condition which will enable the furnishing of safe, proper and adequate service.

"The owners and employees of such systems shall at all times *exercise due care to reduce to a minimum* the hazard of accidental injury to their own or fellow employees, to the public and other utilities due to the presence of overhead wires." (Italics added.)

and communication systems shall be maintained in safe condition and specifically imposes a duty of due care to minimize the hazards involved with overhead utility wires. (*Perrine* v. *Pacific Gas & Elec. Co.* (1960) 186 Cal.App.2d 442, 447 [9 Cal.Rptr. 45].) Manifestly, the rule *imposes* a duty of care and does not withdraw or limit liability. Moreover, the rule is inapposite to the factual situation before us. This is not a case like *Perrine, supra,* where the plaintiff accidentally came into contact with the utility's overhead wires; rather, in this case a transformer which simply happened to be on an overhead pole (as opposed to in an underground vault) malfunctioned and sent extraordinarily high voltage directly into the electrical system of plaintiffs' home. Even if we were to read rule 31.1's command to "be careful" with overhead wires to preclude liability without fault for overhead-wire accidents, we would not be justified in extending the rule's reach to the facts of this case. We conclude rule 31.1 does not bar imposition of strict liability in tort when the electricity *actually received by the consumer at her residence* is dangerously in excess of her reasonable expectations and the utility's intentions.

■ ▪ PG & E also contends that plaintiffs failed to plead their claim that the electricity itself, rather than the transformer, was the defective product at issue. PG & E correctly points out that plaintiffs' complaint alleged their injuries were caused by defective electrical *equipment,* not defective electricity, and that plaintiffs never sought to amend their complaint.

■ The general and longstanding rule is that a party must recover on the cause of action he has alleged in his complaint and not on another cause of action disclosed by the evidence. (*Barrere* v. *Somps* (1896) 113 Cal. 97, 102 [45 P. 572]; *Weissensee* v. *Chronicle Publishing Co.* (1976) 59 Cal.App.3d 723, 729 [129 Cal.Rptr. 188].) However, the general rule may yield where a case is tried on the theory that a matter is in issue and evidence is received thereon without objection. (*Weissensee, supra,* 59 Cal.App.3d at p. 729; see *People* v. *Toomey* (1984) 157 Cal.App.3d 1, 11 [203 Cal.Rptr. 642]; 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 336, p. 3138.)

■ " ' "It has long been settled law that where (1) a case is tried on the merits, (2) the issues are thoroughly explored during the course of the trial and (3) the theory of the trial is well known to court and counsel, the fact that the issues were not pleaded does not preclude an adjudication of such litigated issues and a review thereof on appeal." ' " (*People* v. *Toomey, supra,* 157 Cal.App.3d at p. 11, quoting *Davis* v. *Cordova Recreation & Park Dist.* (1972) 24 Cal.App.3d 789, 794 [101 Cal.Rptr. 358].)

Here the issue of whether electricity is a product was tendered to the trial court in the following ways:

The issue was first broached by PG & E itself in its trial brief and motion for nonsuit on the issue of products liability.[3] This trial brief was made available to the trial court several days before the hearing on the motion for nonsuit. PG & E's brief anticipated the argument eventually made by plaintiffs that electricity itself is a "product" for strict tort liability purposes. At the hearing on the motion, PG & E's counsel called the trial court's attention to the trial brief.

The trial court was also in possession of plaintiffs' memorandum of points and authorities in support of their motion for directed verdict, which made the argument that electricity is a "product."[4] Plaintiffs' memorandum in-

[3]PG & E's trial brief and motion for nonsuit provided in pertinent part that: "PGandE expects the plaintiffs to request product liability instructions on the basis that *electricity* is a product, although their pleadings refer only to *equipment*. (See, Complaint, [¶] 2, p. 5.) This is an attempt to 'bootstrap' their defective transformer theory to the jury. If *any* product was defective it was the *transformer*. But because PGandE only uses transformers and never sells or places them in the stream of commerce, a products liability theory must fail. In addition, electricity is a service, not a product.

"Strict product liability is not imposed on a person who furnishes a service rather than a product. (*Allied Props.* v. *John A. Blume & Assoc.* (1972) 25 C.A.3d 848, 855; *Fogo* v. *Cutter Labs., Inc.* (1977) 68 C.A.3d 744, 750 [furnishing blood to a patient is a service, not a sale of a product].)

"What is electricity? Simply stated, it is a *force*, like the wind, with the *potential* to do work. Electricity alone cannot perform work. Electricity alone is useless from a consumer's point of view. Electricity is a stream of electrons that is created, transmitted, distributed, and converted to energy, all within milliseconds. *No California court has ever held that electricity is a product.*" (Italics in original.)

[4]Plaintiffs' memorandum of points and authorities provided in pertinent part that: "Electricity itself is a product. '"Product" means any object possessing intrinsic value, capable of delivery either as an assembled whole or as a component part or parts, and produced for introduction into trade or commerce.' Model Uniform Product Liability Act 44 Fed. Reg. 62, 714, 62, 717 (1979). It also has been recognized as a product under the Restatement of Torts 2d § 402A by the Wisconsin Supreme Court in *Ransome* v. *Wisconsin Electrical Power Co.* (1979). In Illinois, although they assumed electricity was a "product," arguendo, they decided it cannot be held that wires fall within the definition of packaging for injuries received when an electrical current arced from uninsulated wires. The Illinois Supreme Court rationalized that the electricity was not contended to be defective and it was still in an unmarketable state not having been released into the stream of commerce by sale or display to the customer when the plaintiff touched the wire while erecting an antenna. *Genaust* v. *Illinois Power Company*, 62 Ill 2d 456, 434 N.E. 2d 465, 82 ALR 3d 205.

"Unlike the facts of *Genaust* v. *Illinois Power Company*, supra, in the case at bar the electricity was in the process of being released or had already been released into the stream of commerce; and, in the act of doing so, defendant permitted the electricity to escape into plaintiff's residence in an unsafe form. The defendant claims that its transformer was unexpectedly defective at the time of the reinstallation. The transformer had proved not to be defective in prior use by defendant. Whether the mishap resulted from a defect in defendant's equipment that arose while in defendant's possession, or resulted from the faulty conduct of the employees during the present installation of the transformer, defendant should be subject to strict liability in tort. As a commercial supplier of a product dangerous unless safeguarded, all of the usual policy arguments dictate that defendant be held strictly liable in tort and should now bear plaintiff's burden of loss because her injuries were caused by a defect in either the power supplied, the equipment used by defendant to supply the electricity, or both."

completely cited *Ransome* v. *Wisconsin Elec. Power Co., supra,* 275 N.W.2d 641, which held electricity a "product" for strict tort liability purposes. The memorandum omitted citations to the appropriate reporters. At the hearing on the nonsuit motion plaintiffs' counsel called the trial court's attention to this memorandum and tendered to the trial court a copy of "that Wisconsin case," undoubtedly referring to *Ransome.*

At the hearing on the nonsuit motion, counsel for PG & E again raised the argument that electricity was not a "product."[5] Counsel for plaintiffs responded to this argument.

The trial court indicated it had reviewed and was familiar with the respective authorities submitted on the products liability issue.

In light of the unambiguous argument set forth in the respective memoranda, the authorities cited therein, the arguments of counsel and the trial court's expression of familiarity with those arguments, we have no doubt

---

[5]At the hearing on the motion for nonsuit PG & E's counsel argued: "Let me start, your Honor, with suggesting that the Court can, and I'm sorry, I can't remember the precise number, under Evidence Code Section 451, I believe it is, and I believe shall take judicial notice of the rules and regulations of the California Public Utilities Commission, Rule 16, your Honor, which I have already here in front of me, reads in part as such, all transformers, meters, service wires, et cetera, installed by the utility, at its expense, upon the applicant's premises for the purpose of delivery of electricity, energy, to the applicant, shall continue to be the property of the utility.

"Now, your Honor, they've got a defective transformer their guy testifies.

"They've got evidence that that transformer was defective, they've got a negligence theory which is enough to get them to a jury, and we're not suggesting otherwise.

"They can get to a jury on the negligence theory.

"That transformer, your Honor, was never sold to anybody, and the rules set down by the California Public Utilities Commission are that it remains the property of PG & E, if it's not put into the stream of commerce, a products liability cause of action cannot lie.

"Now they're talking about electricity, which is simply a way to backdoor the transformer in.

"Now, counsel referred to Bell versus Industrial VanGas, a case with which I'm quite familiar, and it's a case that went up either on a demurrer or a summary judgment, I can't recall which, on a dual capacity theory, and a salesman was delivering propane gas to a customer when the canister of gas exploded and injured the salesman, and the court held that for purposes of dual capacity that that was a products liability, because there's that canister of gas that he's delivering to a customer, and the canister explodes and injures the salesman.

"Frankly, your Honor, I have great difficulty in seeing what that's got to do with electricity and what that's got to do with [the] transformer, which remain on the property of P G & E, both in fact and according to CPUC rules.

"Counsel has in his papers cited one case in the United States that has ever held that electricity is a product, and that case is in Wisconsin, but no court in California, your Honor, has ever so held, and as your Honor no doubt knows there have been many, many cases involving electric utilities in the years since Greenman established products liability in California.

"It's simply a way of backdooring the transformer theory to the jury, and they can't get the transformer in, your Honor, because it simply never entered the stream of commerce."

plaintiffs' contention that electricity was a "product" was tendered to opposing counsel and the trial court itself.

■ PG & E relies upon *Lewis* v. *South S.F. Yellow Cab Co.* (1949) 93 Cal.App.2d 849 [210 P.2d 62] for the proposition the trial court properly granted the nonsuit because plaintiffs failed to obtain leave to amend their complaint. A motion to amend would undoubtedly have been the prudent and lawyerlike thing to do. However, we note initially that leave to amend would in all likelihood have been granted since any amendment would have involved the "same general set of facts" as the original complaint, and PG & E had made no showing of prejudice. (*Earp* v. *Nobmann* (1981) 122 Cal.App.3d 270, 286 [175 Cal.Rptr. 767]; see Code Civ. Proc., §§ 469-471; *Glaser* v. *Meyers* (1982) 137 Cal.App.3d 770, 776-777 [187 Cal.Rptr. 242]; *Godfrey* v. *Steinpress* (1982) 128 Cal.App.3d 154, 174 [180 Cal.Rptr. 95].) Later authorities have not followed the strict rule of *Lewis* but have reasoned that if the proof is presented and the issue clearly tendered, the failure formally to amend the pleading is immaterial. (See *Donovan* v. *Wechsler* (1970) 11 Cal.App.3d 210, 213 [89 Cal.Rptr. 669]; 8 Cal. Practice (2d ed. 1981) Pleading—Civil Actions, § 1097, p. 405.) Here, we have no doubt that defendant and, more importantly, the trial court were fully put on notice and informed of plaintiff's theory of liability. In these circumstances, the purpose of an amendment to the complaint was satisfied. Plaintiffs' failure to amend does not bar their pursuit of liability on a theory that electricity was a defective product.

■ We come to plaintiffs' major contention on appeal: that the electricity PG & E furnishes to consumers is a product rather than a service. (See *Shepard* v. *Alexian Brothers Hosp.* (1973) 33 Cal.App.3d 606, 608-609 [109 Cal.Rptr. 132]; *Allied Properties* v. *John A. Blume & Associates* (1972) 25 Cal.App.3d 848, 855 [102 Cal.Rptr. 259]; Cal. Products Liability Actions (rev. ed. 1984) § 2.02[1], p. 2-23.)

PG & E claims that electricity is merely the motion of charged ions and is not an "article" as described by *Greenman.* The courts, however, have not dwelled unduly on electricity's physical properties.[6] Over 20 years ago the California Court of Appeal recognized that "Electricity is a commodity which, like other goods, can be manufactured, transported and sold." (*Baldwin-Lima-Hamilton Corp.* v. *Superior Court* (1962) 208 Cal.App.2d

---

[6]While courts have not dwelled, others have. "Because electricity is intangible, it has consistently been argued by strict liability defendants in cases involving injury by electricity that the intangible force of electrical current is not a 'product' within the meaning of [the Restatement of Torts]. . . ." (*Elgin Airport Inn* v. *Commonwealth* (1980) 88 Ill.App.3d 477 [410 N.E.2 620, 623].)

803, 819 [25 Cal.Rptr. 798].)[7] Although we have found no California case which has considered the issue in the strict tort liability context, the courts of other states have had little trouble in concluding that electricity delivered to homes and businesses is a "product." (See, e.g., *Petroski* v. *Northern Indiana Public Service Company* (1976) 171 Ind.App. 14 [354 N.E.2d 736, 747]; *Hedges* v. *Public Serv. Co.* (Ind.App. 1979) 396 N.E.2d 933, 935; *Ransome* v. *Wisconsin Elec. Power Co., supra,* 275 N.W.2d at p. 647; *Elgin Airport Inn* v. *Commonwealth, supra,* 410 N.E.2d at p. 623; see also *Farina* v. *Niagara Mohawk Power Corp.* (1981) 81 App.Div.2d 700 [438 N.Y.S.2d 645, 646]; *Genaust* v. *Illinois Power Company* (1976) 62 Ill.2d 456 [343 N.E.2d 465, 469-470, 82 A.L.R.3d 285] [assuming arguendo that electricity is a "product"].) As the Supreme Court of Wisconsin aptly put it, "The distribution might well be a service, but the electricity itself, in the contemplation of the ordinary user, is a consumable product." (*Ransome* v. *Wisconsin Elec. Power Co., supra,* 275 N.W.2d at p. 643.)

PG & E relies on *Shepard* v. *Alexian Brothers Hosp., supra,* 33 Cal.App.3d 606, and *Fogo* v. *Cutter Laboratories, Inc.* (1977) 68 Cal.App.3d 744 [137 Cal.Rptr. 417], to support its argument that provision of electricity is a service rather than a product. Both cases are readily distinguishable.

*Shepard* and *Fogo* relied in part on Health and Safety Code section 1606, which legislatively answered the question there presented, that supply of blood and blood products was a service rather than a sale. (*Shepard,* 33 Cal.App.3d at p. 609; *Fogo,* 68 Cal.App.3d at p. 752.) *Shepard* and *Fogo* also noted that some defects in blood products were inevitable, and that no policy reason existed to impose absolute liability on the supplier for defects it could not avoid. (*Shepard,* at pp. 611-612; *Fogo,* at pp. 752-753.) Here, evidence at trial suggested the accident could have been avoided through testing transformers but testing would have been more costly than the alternative.[8]

---

[7]PG & E's other principal product provides an apt analogy: if by some fluke a PG & E gas line delivered not methane gas but highly explosive hydrogen gas to a customer's range or dryer, with predictable results, we would have little trouble concluding that gas is a "product" for tort liability purposes.

[8]*Shepard* noted that a hospital's supplying of blood "is entirely subordinate to its paramount function of furnishing trained personnel and specialized facilities in an endeavor to restore the patient's health. . . . The patient who enters a hospital goes there not to buy medicine or pills, . . . but to obtain a course of treatment [Citations]. It is also obvious that in the normal commercial transaction contemplated in the strict liability cases the essence of the transaction relates *solely* to the article sold, the seller is in the business of supplying the product to the consumer and it is that, and that alone for which he is paid [Citation]." (33 Cal.App.3d at p. 611, italics in original.) Here, unlike in *Shepard,* the essence of the transaction between plaintiffs and PG & E related solely to the provision of electricity; and electricity is, of course, one of PG & E's two principal products.

We readily acknowledge that PG & E's liability should not depend simply upon whether electricity is or is not labeled a "product." More significantly, we believe the policy justifications for strict liability in tort support its imposition in this case. (See *Daly* v. *General Motors Corp.* (1978) 20 Cal.3d 725, 736 [575 P.2d 1162].) This court has identified four main policy grounds for the doctrine: (1) to provide a "short cut" to liability where negligence may be present but is difficult to prove; (2) to provide an economic incentive for improved product safety; (3) to induce the reallocation of resources toward safer products; and (4) to spread the risk of loss among all who use the product. (*McDonald* v. *Sacramento Medical Foundation Blood Bank* (1976) 62 Cal.App.3d 866, 874 [133 Cal.Rptr. 444]; see 50 Cal.Jur.3d, Products Liability, § 17, p. 809; see also *Cronin* v. *J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 133 [104 Cal.Rptr. 433, 501 P.2d 1153]; *Escola* v. *Coca-Cola Bottling Co.* (1944) 24 Cal.2d 453, 461-462 [150 P.2d 436] (Traynor, J., conc.).)

Proof of negligence in cases such as this requires a plaintiff to present to a jury evidence of the inner workings of an electrical power system of vast and complex proportions. The technical operation of such systems and of electricity itself is far beyond the knowledge of the average juror. The expert witnesses who can explain such systems to the jury are concentrated within the industry itself and may be reluctant to serve as expert witnesses in plaintiff's cases. Moreover, PG & E is in a much better position than a consumer-plaintiff to diagnose—and ultimately to correct—the failures which inevitably occur in systems of such magnitude.

In addition, where, as here, a huge surge of injury-causing electricity is traceable to a defective component (the transformer) in the utility's system, imposition of strict liability creates an incentive for utilities to *avoid* accidents before they occur, by investing in safer products. Although, as PG & E notes, its current practices and procedures are extensively regulated by the PUC and its General Order 95, the PUC has certainly not forbidden testing transformers before they are connected to 12,000-volt powerlines. Nothing in the record suggests the PUC is of the view that electric utility procedures are incapable of being made safer.

Finally, strict liability in tort spreads the costs of personal injuries among millions of consumers of electricity instead of imposing those costs upon blameless victims chosen by chance. It is proper that those who seek to benefit from a product should bear the associated costs and should not ask the unfortunate but inevitable victims selected (literally) by accident to bear the burden unaided.

We conclude that PG & E, as a commercial supplier of electricity, is subject to strict liability in tort for personal injuries caused by delivery

of electricity at dangerously high voltage due to a defective transformer. Accordingly, the trial court's entry of nonsuit was error. (*Carson* v. *Facilities Development Co., supra,* 36 Cal.3d at pp. 838-839.)

We emphasize that our holding is limited to cases where the electricity is actually in the "stream of commerce," and expected to be at marketable voltage. In most cases this will mean the electricity must be delivered to the customer's premises, to the point where it is metered, although the many variations in electrical systems prevent our drawing a "bright line" at a particular point.[9] We concur in the limitations uniformly adopted by other jurisdictions which have excluded the "antenna cases" [plaintiff, installing TV antenna, accidentally touches antenna to powerline] and the "plaintiff-touches-downed-power-line" cases from liability-without-fault because in those cases contact with the power line comes at a point where the electricity is not in the stream of commerce or is not in marketable form. (See *Genaust* v. *Illinois Power Company, supra,* 343 N.E.2d at p. 470; *Farina* v. *Niagara Mohawk Power Corp., supra,* 438 N.Y.S.2d at p. 646; *Hedges* v. *Public Serv. Co. of Indiana, Inc., supra,* 396 N.E.2d at p. 935.)[10] Moreover, in such cases (as with cases where dangerously high voltage is attributable to acts of God), the utility generally cannot prevent the accident using reasonably available means. (Cf. *Shepard* v. *Alexian Brothers Hosp., supra,* 33 Cal.App.3d at pp. 611-612; *Fogo* v. *Cutter Laboratories, Inc., supra,* 68 Cal.App.3d at pp. 752-753.)

Nor do we have occasion in this case to examine whether a commercial supplier of electricity should be strictly liable for property damage or for any specie of damage caused by delivery of electricity at *less than* marketable voltage, i.e., damage caused by a "brown-out." Those situations may well involve policy considerations not present in the scenario currently before us.[11]

---

[9]Evidence presented at trial suggested that at least one of the two electric meters on plaintiffs' premises was removed by the PG & E crew, yet electricity was still able to pass through the meter's socket and into plaintiffs' residence. In many larger electric systems removal of the meter does not interrupt the flow of electricity. We do not suggest that unplugging the meter is sufficient to withdraw the electricity from the "stream of commerce," thereby exempting the utility from strict liability in tort.

[10]Where lightning strikes a powerline and enters a consumer's home, causing damage, the utility is not strictly liable because it has not marketed a "product" at all—in such cases the utility has provided only a connecting medium through which a force of nature enters the consumer's home and causes injury.

[11]We also note that evidence at trial suggested plaintiffs' electrical system contained three defects: insulation on a power cable had cracked and allowed arcing from the power cord to the propane gas line, the propane gas system was improperly grounded to the electrical system, and the water system (a private well) provided an inadequate ground for the electrical system. Nothing in our opinion should be construed as limiting PG & E's defenses based upon plaintiffs' failure to exercise due care in maintaining and operating their electrical system. (See *Daly* v. *General Motors Corp., supra,* 20 Cal.3d at pp. 731-743.)

## II

■ Plaintiffs also contend the trial court erred in denying their motion for directed verdict on the issue of ultrahazardous activity, as liability was established as a matter of law. Plaintiffs are mistaken.

The doctrine of ultrahazardous activity provides that one who undertakes an ultrahazardous activity is liable to every person who is injured as a proximate result of that activity, regardless of the amount of care he uses. (*McKenzie* v. *Pacific Gas & Elec. Co.* (1962) 200 Cal.App.2d 731, 736 [19 Cal.Rptr. 628]; see 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, §§ 799-808, pp. 3096-3104.) The doctrine of ultrahazardous activity focuses not on a product and its defects but upon an activity intentionally undertaken by the defendant, which by its nature is very dangerous. In this case it is of course true that the ultimate result of the transformer failure was very hazardous: over 7,000 volts of electricity were sent into a residential electrical system designed for no more than 240 volts. However, the doctrine scrutinizes not the accident itself but the activity which led up to the accident—in this case, the maintenance of high-voltage powerlines and transformers. Thus, the issue is whether maintenance of high-voltage power systems by public utilities is an ultrahazardous activity. We conclude it is not.

Our Supreme Court has limited the doctrine of ultrahazardous activity to encompass only activities which are neither commonplace nor customary. (*Luthringer* v. *Moore* (1948) 31 Cal.2d 489, 498 [190 P.2d 1].) In this case the allegedly ultrahazardous activity has become pervasive and is now entirely commonplace. (See, e.g., *Clark* v. *Di Prima* (1966) 241 Cal.App.2d 823 [51 Cal.Rptr. 49] [water escaping irrigation ditch; no liability as ditches now in widespread use].) We therefore join the court in *McKenzie* v. *Pacific Gas & Elec. Co., supra,* 200 Cal.App.2d 731, in concluding that maintenance of electric power lines is not "ultrahazardous." (P. 736.) The trial court's refusal to direct a verdict for plaintiffs on this issue was proper.

## III

■ Plaintiffs next contend the trial court should have directed a verdict in their favor on the issue of implied warranty of fitness for particular purpose (Cal.U.Com.Code, § 2315). Nothing in plaintiffs' complaint indicated they were pursuing a theory of implied warranty. We conclude that this issue, unlike the products liability and ultrahazardous activity issues, involved questions of fact and law which were outside plaintiffs' pleadings and were not fairly tendered to defendant at trial.

The implied warranty of fitness for particular purpose has been codified in section 2315 of the California Uniform Commercial Code, which provides that "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is *unless excluded or modified under the next section* an implied warranty that the goods shall be fit for such purpose." (Italics added.)[12] The next section, section 2316, provides in pertinent part that "to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof.'" (Cal.U.Com.Code, § 2316, subd. (2).) Section 2316 also provides that "An implied warranty can also be excluded or modified by course of dealing or course of performance or usage of trade." (Cal.U.Com.Code, § 2316, subd. (3)(c).)

Plaintiffs first raised the implied warranty issue in their motion for directed verdict filed some four years after their complaint. Plaintiffs' motion did not allege that the implied warranty was not excluded or modified pursuant to section 2316, nor did plaintiffs present any evidence at trial suggesting the implied warranty was in force at the time of the accident.

PG & E objected that the implied warranty issue was not timely raised. PG & E observed that unanswered questions remained as to the status of any implied warranty and noted that no discovery had been undertaken on the issue. Unlike the products liability issue, the particulars of the implied warranty issue were neither "well known to court and counsel" nor "thoroughly explored during the course of the trial." (*People* v. *Toomey, supra,* 157 Cal.App.3d at p. 11.) That being the case, plaintiffs' failure to plead the implied warranty issue bars recovery on that ground. (*Barrere* v. *Somps, supra,* 113 Cal. at p. 102; *Weissensee* v. *Chronicle Publishing Co., supra,* 59 Cal.App.3d at p. 729.) The trial court's refusal to direct a verdict on the issue was proper.

## IV

Plaintiffs finally raise two instructional errors on the negligence cause of action. Plaintiffs' claim the trial court erred in refusing to instruct

---

[12]In light of our holding in part I, *ante,* that electricity is a "product" for purposes of strict liability in tort we assume arguendo that electricity may also be considered a "good" for purposes of the California Uniform Commercial Code (§ 2105), and that plaintiffs could properly have pleaded a cause of action under this theory. (See *Baldwin-Lima-Hamilton Corp.* v. *Superior Court, supra,* 208 Cal.App.2d at p. 819 [electricity a "commodity"]; see also *Helvey* v. *Wabash County REMC* (1972) 151 Ind.App. 176 [278 N.E.2d 608, 610, 48 A.L.R.3d 1055].)

with a modified form of BAJI No. 9.21, dealing with commercial suppliers' duty of reasonable care.[13] The instruction provides, in part, that the supplier must exercise reasonable care in testing and inspecting component parts made by others.

In light of our conclusion in part I, *ante,* that electricity is a "product," we hold that plaintiffs' requested instruction was a correct statement of the law. PG & E contends, however, that the instruction was duplicative of matters adequately covered in other instructions and that its omission was harmless error. We agree with PG & E.

The trial court instructed with BAJI Nos. 3.10, 3.11, 3.12, and plaintiffs' instruction based on PUC rule 31.1.[14] Although the proffered instruction focused more clearly than the others upon the commercial supplier's duty to perform reasonable testing and inspection of component parts furnished

---

[13]Plaintiffs' requested instruction read as follows: "The *commercial supplier* of a product that is reasonably certain to be dangerous if negligently made, has a duty to exercise reasonable care in the [design] [manufacture] [testing and inspection] of the product [and in the testing and inspection of any component parts made by another] so that the product may be safely used in a manner and for a purpose for which it was made.

"A failure to fulfill that duty is negligence."

[14]The trial court instructed the jury as follows: "Negligence is the doing of something which a reasonably prudent person would not do, or the failure to do something which a reasonably prudent person would do, under circumstances similar to those shown by the evidence.

"It is the failure to use ordinary or reasonable care.

"Ordinary or reasonable care is that care which persons of ordinary prudence would use in order to avoid injury to themselves or others under circumstances similar to those shown by the evidence.

"[You will note that the person whose conduct we set up as a standard is not the extraordinarily cautious individual, nor the exceptionally skillful one, but a person of reasonable and ordinary prudence,] [Exact copy of BAJI No. 3.10]

"One test that is helpful in determining whether or not a person was negligent is to ask and answer whether or not, if a person of ordinary prudence had been in the same situation and possessed of the same knowledge, he would have foreseen or anticipated that someone might have been injured by or as a result of his action or inaction. If the answer to that question is 'yes,' and if the action or inaction reasonably could have been avoided, then not to avoid it would be negligence. [Exact copy of BAJI 3.11 (1977 Rev.)]

"The amount of caution required of a person in the exercise of ordinary care depends upon the danger which is apparent to him or should be apparent to a reasonably prudent person under circumstances similar to those shown by the evidence. [Exact copy of BAJI No. 3.12]

"Rule 31.1 of General Order 95 of the CPUC, Rules for Overhead Electric Line Construction read on the date of the accident as follows:

" 'Electrical supply and communication systems shall be of suitable design and construction for their intended use, regard being given to the condition under which they are to be operated, and shall be maintained in a condition which will enable the furnishing of safe, proper and adequate service.

" 'The owners and employees of such systems shall at all times exercise due care to reduce to a minimum the hazard of accidental injury to their own or fellow employees, to the public and other utilities due to the presence of overhead wires.' "

by others, we conclude the point is adequately covered in plaintiffs' instruction based on PUC rule 31.1, which requires that *entire electrical systems, necessarily including all* component parts, be in such condition as to operate safely. (See fn. 14, *ante.*) We cannot say, after examining the entire cause, that it is reasonably probable a result more favorable to plaintiffs would have been reached had the proposed instruction been given. (*Seaman's Direct Buying Service, Inc. v. Standard Oil Co.* (1984) 36 Cal.3d 752, 770 [206 Cal.Rptr. 354, 686 P.2d 1158]; see *LeMons v. Regents of University of California* (1978) 21 Cal.3d 869, 876 [148 Cal.Rptr. 355, 582 P.2d 946].)

■ Plaintiffs finally contend the trial court erred in refusing to instruct with BAJI No. 3.45 (negligence per se—violation of a statute) based upon PUC rule 31.1. However, rule 31.1 is merely a statement of the common law rule of due care and cannot be the basis of negligence per se. (*Perrine v. Pacific Gas & Elec. Co., supra,* 186 Cal.App.2d at p. 447; *Lewis v. Pacific Gas & Electric Co.* (1949) 95 Cal.App.2d 60, 63 [212 P.2d 243].) The trial court correctly refused the instruction.

### DISPOSITION

The judgment (order) granting nonsuit on the issue of strict liability in tort is reversed and the matter is remanded for further proceedings consistent with this opinion. In all other respects the judgment is affirmed.

Sparks, J., concurred.

**EVANS, Acting P. J.**—I respectfully dissent from the result only; I fully concur in the rationale of the majority opinion that Pacific Gas and Electric Company (hereafter P. G. & E.) or any commercial supplier of electricity may be subject to strict liability in tort for personal injuries caused by delivery of electricity under certain conditions.

However, I do not view that reasoning to be applicable to the posture in which I view the facts of the case. Nothing in plaintiffs' pleadings or in the evidence relative to defective electricity was tendered to the defendant prior to or at trial.

Plaintiffs' complaint did not directly or impliedly assert liability predicated upon a defect in the electricity supplied by P. G. & E.; the complaint was patently clear in its assertion that the plaintiffs considered the defective product to be the transformer and not the electricity. The only evidence presented by plaintiffs on the question of causation was directed to the transformer. Plaintiffs' only expert, Dr. James Gordon Simes, confined his tes-

timony to the deficiencies of the transformer and not on faulty or defective electricity. Moreover, counsel for plaintiffs conceded during argument on defendant's motion for nonsuit that, in his opinion, his expert had established product liability on the theory of a defective transformer. In that connection, the evidence was uncontroverted that P. G. & E. was a buyer and user of the transformer, not the designer, manufacturer, or distributor. I would conclude under the factual and procedural circumstances that the question of strict liability in tort for defective electricity involved issues of law and fact dehors the evidence and pleadings, and those issues were not fairly tendered to defendant at trial.

Plaintiffs could have pleaded and presented such a cause and legal theory. They did not. The issue was raised by plaintiffs' counsel in responding to defendant's motion for nonsuit. As the majority opinion concludes on the question of implied warranty, I would also conclude on the question of strict liability for defective electricity, that the particulars of that issue, not the question of a defective transformer, was neither " ' " "well known to court and counsel" ' " nor " ' " "thoroughly explored during the course of the trial." ' " (*People* v. *Toomey* (1984) 157 Cal.App.3d 1, 11 [203 Cal.Rptr. 642].) I would conclude that by reason of plaintiffs' failure to plead or present at trial a strict liability cause of action predicated upon defective electricity supplied by P. G. & E., they are barred from recovery on that basis.

I would affirm the judgment in its entirety.